Henry Slack McNEIL, Jr., Plaintiff,

v.

John C. BENNETT, Jr., Charles E. Mather, III, Shaun F. O'Malley, PNC Bank, N.A., and Wilmington Trust Company, as Trustees U/A with Henry Slack McNeil dated January 2, 1959, Barbara McNeil Jordan, Marjorie McNeil Findlay, and Robert Douglas McNeil, Defendants.

Civ.A. No. 15875.

Court of Chancery of Delaware, New Castle County.

Submitted: June 21, 2001.
Decided: July 6, 2001.
Revised: Nov. 8, 2001.

James M. Mulligan, Jr., Collins J. Seitz, Jr., and Samuel D. Brickley II, of Connolly Bove Lodge & Hutz, Wilmington; Lawrence T. Hoyle, Jr., R. David Walk, Jr., and Elliot C. Fertik, of Hoyle, Morris & Kerr, Philadelphia, Pennsylvania; Ralph A. Jacobs, of Ralph A. Jacobs & Associates, Philadelphia, Pennsylvania, of counsel, for Plaintiff.

Johannes R. Kramer, Thomas R. Hunt, and David J. Teklits, of Morris, Nichols, Arsht & Tunnell, Wilmington, for Defendants John C. Bennett, Jr., Shaun F. O'Malley, Charles E. Mather, III, PNC Bank, N.A., and Wilmington Trust Company.

Wayne N. Elliott, Elizabeth M. McGeever, and Sheldon K. Rennie, of Prickett, Jones & Elliott, Wilmington; John G. Treitz, Jr., of Ogden Newell & Welch, Louisville, Kentucky, of counsel, for Justin and Cameron McNeil.

Lawrence C. Ashby and Richard I.G. Jones, of Ashby & Geddes, Wilmington, for Barbara McNeil Jordan, Marjorie McNeil Findlay, and Robert Douglas McNeil.

Grover C. Brown, of Gordon, Fournaris & Mammarella, Wilmington, Guardian Ad Litem for the Minor and Unborn Beneficiaries of the Trust for Lois Fernley McNeil and Others.

## MEMORANDUM OPINION

STRINE, Vice Chancellor.

Henry S. McNeil, Jr. ("Henry" or "Hank") brought this case to challenge certain actions of the trustees of a trust created by his late father, Henry S. McNeil, Sr. ("Mr. McNeil, Sr.") for the benefit of Henry's mother, Lois F. McNeil ("Lois"), her children, her lineal descendants, and their spouses (the "Lois Trust"). In particular, Henry complains that the Trustees of the Lois Trust (the "Lois Trustees" or the "Trustees") failed to inform him that he was an eligible current beneficiary of that Trust for decades, thus depriving him of the opportunity to request distributions. Instead of notifying Henry of his status, the Lois Trustees administered the Lois Trust with a nearly exclusive focus on Lois during her lifetime. Indeed, for the ten years before Lois's death, the Lois Trustees made no distributions to anyone from the Lois Trust, enabling it to grow enormously. Meanwhile, Lois lived off a marital trust left for her, and Henry and his three siblings lived off other family trusts created for them by Mr. McNeil, Sr. The decision to cut off distributions from the Lois Trust was made with input and encouragement from the advisors for Henry's siblings, who received preferential treatment in this and other respects from the Lois Trustees.

In this post-trial opinion, I conclude that the Lois Trustees breached their duties by failing to inform Henry of his rights in a timely fashion, by being (perhaps unwittingly) partial to his siblings, by ignoring the interests of Henry and his branch of the McNeil Family, and by persistently allowing the Lois Trust to operate "on autopilot." But during this same period, Henry had other substantial resources. Moreover, the Trustees' partiality to his siblings did not involve disproportionate distributions to them out of the Lois Trust. As a result, the appropriate remedy is much more limited than Henry desires. Thus, I grant Henry (and his adult children) a make-up distribution from his branch's aliquot share of the Lois Trust, surcharge the Lois Trustees for one-fifth of their commissions for a nine-year period during which they ignored Henry's interests, and remove one of the Lois Trustees and replace that institutional trustee with a trustee in whom Henry can have full confidence. At the same time, I reject

Henry's challenge to the Trustees' decision to divide the Lois Trust into four equal resulting trusts for each of the McNeil Family branches, and to their decision to distribute Trust assets in the meantime under a unitrust formula.

## I. *Factual Background*

### A. *The Origins And Initial Operation Of The Lois Trust*

In 1959, Mr. McNeil, Sr. and Lois gathered their four children, Henry, Jr. (then 15), Barbara (then 13), Marjorie (then 11), and Robert (then 8) for an important announcement.

Mr. McNeil, Sr. explained to his children that his success in business permitted him to do something important for each of them and their mother. He had arranged for a sale of the family business, McNeil Laboratories, to Johnson and Johnson ("J & J") on highly favorable terms that guaranteed the continuation of the Laboratories as an autonomous division within J & J and that involved the appointment of Mr. McNeil, Sr. to a very senior position within J & J's management.

This extraordinary transaction gave Mr. McNeil, Sr. the wherewithal to fund five separate trusts with one million dollars worth of J & J stock[1] each (together the "Family Trusts" or the "Trusts"). The McNeil children were told that one of the trusts (the "Lois Trust") was for their mother.

But the focus of the meeting was on the four related trusts (the "Sibling Trusts"). Each of the Sibling Trusts was named for one of the four children and afforded the trustees wide discretion to deploy the Trust's assets on behalf of the named child, the named child's spouse, and lineal descendants (each Sibling Trust for a "Branch" of the McNeil Family).

The McNeil children were told by their father that their individual Sibling Trusts would give them the freedom to pursue different vocations and to marry who they wished without fear that they would not be affluent. To illustrate this point, Mr. McNeil, Sr. used an example that few would dare venture now. He noted that the Trusts would allow his daughter Marjorie to marry a young man who was the son of a minister if she wished, and live the same way as Barbara would if Barbara married a young man who was the son of a wealthy industrialist.

Although the McNeil children were quite young at the time, the meeting left an imprint. Each knew how proud their father was to be able to devote wealth of this kind on their behalf and to guarantee that his children and future generations of McNeils could be free from economic worry.

Although the Lois Trust and the Sibling Trusts were created in 1959, they were not activated until 1969. During the preceding decade, Mr. McNeil, Sr. worked to secure a favorable ruling from the Internal Revenue Service that enabled the proceeds of the Family Trusts to be free from federal Generation Skipping Taxes ("GST") until their termination, which was not expected until 2060.[2]

At or around the time that their father informed them that the Family Trusts were going to be activated, he again discussed the purpose of the Trusts in conversations with each of the Siblings, who were then at ages at which they were more

---

1. The Trusts were funded initially with McNeil Laboratories stock, which was converted into J & J stock after J & J completed its acquisition of McNeil Laboratories.

2. All of the Trusts terminate twenty-one years after the death of the last living Sibling.

likely to grasp and retain the details of what their father was imparting to them. Mr. McNeil, Sr.'s remarks led each of the children to take away the belief that the Sibling Trust named for them was established primarily for them during their lifetime and that the concerns of future generations were secondary and contingent. Likewise, each believed that "mother's trust"—the Lois Trust—was for their mother during her lifetime.

Upon their activation, each of the Trusts began to operate independently, but under the supervision of a common group of trustees (generally, the "Trustees") who had been named in the "Trust Instruments." Thus, the Lois Trust and the Sibling Trusts each had the following general trustees: George Brodhead, Mr. McNeil, Sr.'s trusted friend and legal advisor; Robert C. Fernley, Lois McNeil's brother; and Henry W. Gadsen, another friend of Mr. McNeil, Sr. Under the Trust Instruments, the general trustees exercised the discretionary powers of the Trusts. Each of the Trusts also shared a common administrative trustee, Wilmington Trust, which only had the power to vote on discretionary matters when there was a tie vote among the general trustees.[3]

From the inception, however, it appears that Brodhead was the dominant Trustee on all the Trusts. With the benefit of two trials and some considered thought, I infer that Brodhead drew much of his authority from Mr. McNeil, Sr. himself, who received detailed statements about the administration of each of the Trusts. As will be seen, the Trust Instruments vested extraordinarily wide discretion in the Trustees. While this flexibility could be seen as giving the Trustees the freedom to ignore Mr. McNeil, Sr.'s wishes completely, the

flexibility can also be seen as enabling Mr. McNeil, Sr. to keep a firm hand on the administration of the Trusts during his own lifetime, through a group of Trustees who respected and had fond feelings for him. In particular, the very able and diligent Brodhead appears to have approached the job of general trustee with a zealousness and fidelity to Mr. McNeil, Sr. akin to that of a lawyer to his client. Put somewhat differently, although it is the intent of the settlor at the time of the creation of a trust that is supposedly the legally relevant factor,[4] as a matter of factual reality, the post-creation desires of Mr. McNeil, Sr. likely influenced the conduct of the Trustees of the Trusts in a profound manner until Mr. McNeil Sr.'s death in 1983.

Until Mr. McNeil, Sr.'s death, the Trusts operated in a fashion that reinforced the impression that the McNeil after whom the Trust was named was the primary beneficiary of the Trust during his or her lifetime, with future generations having remainder interests only. Although we shall see that this understanding was not reflected in the Trust Instruments themselves, it was the operational reality of the Trusts during Mr. McNeil, Sr.'s lifetime.

Thus, each Sibling Trust was administered in a manner that was designed to meet the needs of the named beneficiary. The named beneficiaries were expected to provide the Trustees with information about their spending needs and habits. The Trustees then provided them with income distributions, principal distributions to fund the purchase of a home befitting a McNeil, and otherwise very limited principal. Likewise, the Trustees over time changed the investment mix of each Trust

---

3. Lois Trust ("LT"), Art. III(e).

4. *Bishop v. McNeil*, Del.Ch., C.A. No. 15508, 1999 WL 743489, mem. op. at 46 & n. 17, Strine, V.C. (Sept. 14, 1999).

to better suit the particular needs of the named beneficiary. For example, the Trust for Henry's Branch (the "Henry Trust") became more heavily invested in income-producing investments at the request of Henry and his advisors. This choice necessarily affected the future growth prospects of his Trust.

By contrast, Lois McNeil took great pride in J & J and believed in the company. She was adamant that her Trust remain invested in J & J, despite the fact that it gives Trust officers hives to invest predominately in equities—much less the common stock of a single company—and despite the fact that the Lois Trustees deemed it more prudent to diversify. As a result, her Trust continued to consist largely of the original J & J shares (adjusted for splits and other events) with which it had been funded.[5]

This simple mode of operation worked relatively smoothly during Mr. McNeil, Sr.'s lifetime. None of his grandchildren had yet reached majority and all were expected to be taken care of by their parents, the named beneficiaries. This understanding accorded with normal societal expectations, but also had the effect of reinforcing the Siblings' belief that the members of the next generation were in essence remaindermen. Likewise, all the Siblings felt that the Lois Trust was "mother's trust" and were told as much by Mr. McNeil, Sr. and their mother. Therefore, none of them harbored the notion that they were entitled to apply for additional funds from the Lois Trust, to supplement the distributions they received from their own Trusts.

As will now be shown, these beliefs are more indicative of the views expressed by Mr. McNeil, Sr. outside of the Trust Instruments, than of the words of the Trust Instruments he signed.

## B. *The Key Provisions Of The "Lois Trust"*

The "TRUST FOR LOIS FERNLEY MCNEIL AND OTHERS" is governed by trustees with wide discretion. As noted previously, pursuant to Article III of the Trust Agreement, the Lois Trust is subject to governance by a group of trustees consisting of general trustees and an administrative trustee. The general trustees possess the authority to exercise the discretion vested in the Trustees by the Trust Agreement, and the administrative trustee only votes on such matters in the event that the general trustees are evenly divided. All of the general trustees named in the Trust Instruments were close confidants of Mr. McNeil, Sr., and each was given the authority to name his own successor.[6] In the event that a general trustee did or could not exercise this authority, the remaining general trustees had the authority to fill the vacancies and/or to increase or decrease the number of general trustees.[7]

The Lois Trust has three intended classes of beneficiaries: (1) Lois herself; (2) the "lineal descendants" of Mr. McNeil, Sr., which included his then-living children and any descendants born or adopted thereafter; and (3) spouses or widows of lineal descendants, but excluding former spouses and spouses who were separated

---

**5.** Lois received extensive principal distributions from the Lois Trust, in some contrast to the Siblings. But Lois also insisted that her Trust remain invested in a portfolio that emphasized principal growth over current income.

**6.** LT, Art. III(c).

**7.** *Id.*

pursuant to a judicial decree.[8] Article II of the Trust Instrument gave the Trustees extraordinarily broad discretion to determine how to use the Trust's assets on behalf of the beneficiary classes:

### ARTICLE TWO

(a) The trustees in their discretion may accumulate the income of the trust and add it to principal or may, at any time or from time to time, distribute any part or all of the income and principal of the trust to or among my lineal descendants and their spouses, and Lois. All distributions under this Paragraph (a) shall be at such times and in such proportions and amounts as the trustees shall determine, and the trustees shall have the power to omit from participation in any or all of such distributions any one or more of the persons among whom such distributions could be made.

(b) In making the distributions authorized by Paragraph (a) of this ARTICLE TWO, the trustees may distribute outright to, or in trust for, any one or more of the class among which they may distribute, whether or not such members of the class are in being when the distribution is made; may select the trustee or trustees if they distribute in trust; may, with respect to any such newly created trust, create powers of appointment in the trustee or trustees or in any beneficiary hereunder; may, if they distribute to a trust, establish and select a committee for such trust and provide such powers and functions for the committee and the trustee or trustees as they deem appropriate, including any or all of the powers and functions granted to the committee and trustees under this instrument; may impose lawful spend-thrift provisions; may exercise their powers of distribution as to all or any part of the property subject thereto; and, generally, they may distribute in any manner they shall determine; *provided,* always, *however,* that any such distribution to a new trust shall be made so that no part of the income or principal of such new trust will at any time be distributed to any person to whom at the time of such distribution a distribution could not have been made under this trust if the property had continued in this trust.[9]

As the plain language of the Lois Trust demonstrates, the living lineal descendants of Mr. McNeil, Sr. were not mere remaindermen, they were eligible current beneficiaries. While the Trustees had no duty to make distributions to any beneficiary, including Lois, they clearly had the authority to do so.

A similar situation existed in each of the Sibling Trusts. Rather than restricting distributions to the named Sibling during that Sibling's lifetime, each of the Sibling Trusts made the spouses and lineal descendants of the named Sibling current beneficiaries eligible to receive distributions. The provision in Henry's Trust (the "Henry Trust") illustrates this:

The trustees in their discretion may accumulate the income of the trust and add it to principal or may, at any time or from time to time, distribute any part or all of the income and principal of the trust to or among Henry, ... [or] his lineal descendants ... All distributions under this Paragraph (a) shall be at such times and in such proportions and amounts as the trustees shall determine .... [10]

---

8. *Id.,* Art. I(a).

9. *Id.,* Art. II(a), (b) (emphasis in original).

10. Henry Trust, Art. II(a).

Mr. McNeil, Sr. coupled the broad discretion he gave to the Trustees under all the Trust Instruments with provisions giving the Trustees maximum freedom to carry out their duties free from the fear of judicial second-guessing and the threat of monetary liability. Therefore, Article III(e) of the Lois Trust states that "Any decision or action of the [Trustees] shall be final and binding upon all persons and not subject to judicial review." And Article IV(c) provides that any "action taken by the trustees in good faith shall be proper, and I relieve the trustees of all personal liability except for gross negligence or willful wrongdoing."

With the key provisions of the Lois and Sibling Trusts set forth, I now turn to the events of the last twenty years that have generated the current dispute.

### C. Henry's Estrangement From His Family

During much of the 1970s and the early 1980s, Henry was estranged from his parents and his Siblings (the "Other Siblings"). This same period was characterized by some conflict between Henry and the Trustees over the administration of his Sibling Trust, as well as Brodhead's intrusion into aspects of Henry's personal life that were beyond Brodhead's proper purview as a Trustee.

The split in the Family began to manifest itself in the Trustees' administration of the Family Trusts. To some extent this was natural. Because the Family Trusts had common Trustees, it could be seen as efficient to deal with as many family members in one group as possible, assuming this met with their satisfaction. But because the McNeil Family divide resulted in a situation where only one family member, Henry, was excluded, the Trustees' decision to deal with the Other Siblings and

Lois, in even minor respects, as a unit can (with hindsight) be recognized as risking further familial conflict and hurt feelings.

An example of how the estrangement in the family spilled over into Family Trust matters is illustrated by a letter that Brodhead sent all of the Siblings—*except Henry*—in 1979.[11] The letter discussed how the Lois Trust operated and states in pertinent part that:

> It has been brought to my attention that a question exists in the minds of the various beneficiaries under your father's 1959 trusts as to the extent and as to when other members of your father's family might become participants under your particular trust or the trusts for your mother and for your brother and sisters. In discussing this with your father, he thought it might be well for me to write you a letter stating my understanding on these points.

> First, while the trusts for all four of your father's children are similar (each being for that particular child and his or her descendants), the trust for your mother is different.

> *Under your mother's trust such income which is not accumulated and such principal as Trustees may decide may be distributed by the Trustees to and among your mother and your father's lineal descendants (you [(Robert)], Marjie, Barrie and Hank, and their children, etc.) and their spouses at such times and in such proportions as the Trustees shall determine.*

> Your own trust (like similar trusts for your brother and sisters) is for the benefit of yourself, your then spouse (if you marry), your children (including adopted children) and their descendants (including their children, their children's chil-

11. JX 16–19 (letters to Lois and Siblings other than Henry) (emphasis added).

dren, and so on) until the trust is terminated. The trusts of your brother and sisters are similarly for them respectively, their children and descendants.... The income from the trust, which is not accumulated by the trust, and the principal of the trusts which the Trustees decide to distribute may be distributed to you, to your then spouse (if you marry), or to any of your children and (after they shall have married) to their children and so on, and their spouses.

Instead of distributing income to you or other members of your family, the Trustees have the right and authority not to distribute all or any of the income but to accumulate it and add it to the principal of the trust. At the present time, as you know, we are not distributing all of the net income.

Incidentally, I call your attention to the fact that at no time can your mother share in the distribution of your trust or the trust for your brother and sisters. As you know, your mother has her own particular trust which takes care of her needs.[12]

The demise of Mr. McNeil, Sr. and Brodhead obviously compromises my ability to determine with certainty whether a similar letter was sent to Henry. Henry swears not and I believe him. Given the family circumstances and Brodhead's careful nature, the absence of a letter to Henry in the Trustees' files and the presence of copies of the letters to the Other Siblings supports the inference that Brodhead deliberately excluded Henry from this communication. This exclusion was not trivial, given that the letter succinctly explained important aspects of the Trust Instruments.[13]

This period was also characterized by changes in the complement of General Trustees. Robert Fernley resigned in 1978 and was replaced by Provident National Bank ("PNC") on all the Family Trusts. In 1980, Henry Gadsen resigned and was replaced by a trusted friend of Mr. McNeil, Sr.'s, Charles E. ("Pete") Mather, III, on all the Family Trusts. Mr. McNeil, Sr. told Mather that Brodhead was the "man to listen to on the Trust[s]."[14]

### D. Mr. McNeil, Sr. Dies And Excludes Henry From Equal Treatment Under The Will

On May 2, 1983, Mr. McNeil, Sr. died. In his will, Mr. McNeil, Sr. deepened the schism within his family by treating Henry differently than his Siblings. Each of the Other Siblings received very generous bequests that gave them, among other things, ownership interests in the McNeil Family holding company, Claneil Industries. Henry received nothing, however, allegedly because his father "had amply provided for him otherwise ...."[15] Therefore, while Henry was still a rich man by societal standards, his father's decision rendered him the least affluent of the Siblings and an outsider to the Family holding company.

The largest portion of Mr. McNeil's wealth passed to Lois in the form of a "Marital Trust." Lois was given a power of appointment over the Marital Trust. If she exercised that right in Henry's favor

---

12. JX 18 (letter to Robert).

13. The letter, however, made little impression on the Other Siblings. Under Mr. McNeil, Sr.'s and Brodhead's influence, all continued to believe that the named beneficiaries of the Family Trusts were primary, with the interests of other being more akin to remainder or subordinate interests.

14. *Bishop*, mem. op. at 8.

15. Will of Henry McNeil, Sr. at 56.

at her death, she could restore Henry to a position of rough equality with his Siblings. Otherwise, the Other Siblings would receive it, and thus wealth that far exceeded Henry's.

### E. *The Trustees Perpetuate The Family Divide Until Lois McNeil's Death*

After Mr. McNeil, Sr.'s death, the estrangement between Henry and the rest of the Family softened in some respects. In the 1980s, Henry was apparently able to restore his relationship with his mother and saw her quite often. He also seems to have maintained somewhat of a relationship with his Siblings. Unfortunately, Henry's relationship with his own two children, Cameron and Justin, deteriorated into estrangement in this same period, and that estrangement gave rise to considerable problems down the line, as will be seen.

For now, the important point is that the Family schism continued to be perpetuated in the McNeil Family's business planning. Because Henry had no role at Claneil, he was naturally excluded from meetings about it. Similarly, his Siblings had a feeling of fellowship and trust amongst themselves that was qualitatively different from that which existed among them and Henry.

As a result, Lois and the Other Siblings found it efficient to consider certain common issues as a group. Given time constraints and other convenience-related factors, it was also natural that Lois and the Other Siblings would find it attractive to deal with common issues in the Family Trusts all at one time, particularly if they could do so on the same day that they disposed of Claneil-related matters. The Trustees found this appealing because they could address four of the Family Trusts at one time.

A pattern therefore emerged. When Lois and the Siblings wanted to meet with the Trustees, it was common for the Trustees to meet with all of them as a group. This gave Lois and the Siblings the chance to hear from the Trustees about issues affecting all of their Trusts, as well as the opportunity for the beneficiaries to ask questions more specific to their individual Trusts.

At the same time that the Trustees were periodically dealing with Lois and the other Siblings in this manner, they met with Henry about his Sibling Trust. The record supports the conclusion that the Trustees did not discriminate against Henry in terms of the amount of time they spent with him in comparison to his Siblings. Rather, the problem was qualitative in nature.

Unlike his Siblings, Henry never met with the Trustees in their capacity as Trustees of the Lois Trust. He did not participate in meetings at which the Lois Trust was at least one of the subjects for discussion. Henry therefore was at an obvious informational disadvantage to his Siblings with regard to that Trust.

In order to telescope events occurring over many years, I will not attempt a meeting-by-meeting chronology of the Trustees' periodic joint meetings with Lois (and/or her designated representative, Langhorne Smith of Claneil) and the Other Siblings. Rather, I will set forth what I believe is a fair summary of the approach that was taken.[16]

That approach built on the apparent harmony among Lois and the Other Siblings. To the extent that Lois and the Other Siblings were comfortable sharing information with each other, the Trustees

---

16. This synopsis telescopes some issues that arose after Lois's death. Overall, however, the summary is an accurate depiction of the pattern for the 1980s and 1990s.

went with that comfort if that made communications simpler. By way of example, the Trustees had always prepared separate briefing books for Lois and each of the Other Siblings that contained certain information that was specific to each of their Trusts. When Lois and the Other Siblings later gave the Trustees permission, this information was combined into one book.[17] As a result, the Other Siblings received information about the Lois Trust's account balance, holdings, and distributions. Henry did not receive this information. Henry was also excluded from other useful communications that went to Lois and the Other Siblings.

Starting in 1994, for example, Lois and the Other Siblings were also provided with meeting summaries by the Trustees.[18] These summaries are in fact virtual copies of the meeting minutes that the Trustees compiled for their own purposes. The summaries included items discussed regarding the Lois Trust. Henry did not receive these summaries.

The Siblings also had some involvement in issues of substance related to the Lois Trust. The most critical such event occurred in 1987. Before that time, Mrs. McNeil had received regular income distributions from the Lois Trust and had also received some sizable principal distributions. None of the Siblings received anything from that Trust.

After Mr. McNeil, Sr.'s death, Mrs. McNeil had access to the Marital Trust, which was even larger than the Lois Trust. In mid–1987, two of Claneil's top officers, Warrin Meyers and Langhorne Smith, met with lawyers and other financial advisors for Lois and the Other Siblings "concerning estate and income tax planning . . ."[19] This was not unusual in the sense that Lois and the Other Siblings often used Claneil's management to help them manage and plan their personal financial affairs.

What was more unusual is that a request to the Lois Trustees emerged out of this particular meeting. On behalf of Lois, Langhorne Smith sent a letter to the Trustees requesting that "Wilmington Trust Company discontinue its quarterly income distributions from [the Lois Trust] commencing with the quarterly income distribution due in September 1987. At the same time, it is requested that Wilmington advise Carl Werley [PNC's representative on the Trust as well as the Marital Trust] what the amount of Wilmington's quarterly distribution would have been so that the marital trust can make a similar distribution at the same time to Mrs. McNeil" and that "[t]his procedure should then be followed in all subsequent quarters."[20] This change in approach was advocated because the advisors for Lois *and the Other Siblings* had concluded that "*it would prove beneficial for both Lois and her heirs to allow [the Lois Trust] to grow to the greatest extent possible and to meet her financial needs from distributions from the marital trust held at [PNC] . . . .*"[21]

Through a letter from Brodhead, the Trustees promptly assented to this request, and indicated that they would follow Lois's request until they received "further written direction."[22] By mistake, Brodhead carbon copied "Henry S. McNeil" and therefore a copy was sent to Henry, being by then the only living McNeil Family member by that name. Henry passed this

---

17. JX 308; Tr. 764–67; 1326–28.

18. JX 103; Tr. 726–37; 1319–20.

19. JX 60.

20. *Id.*

21. *Id.* (emphasis added).

22. JX 61.

letter on to his attorney, Martin Heckscher.

I credit Heckscher's trial testimony about what happened next. When Heckscher called Brodhead about the letter, Brodhead said that the letter had been sent to Henry by mistake and that it did not address a subject of "any concern" to Henry.[23] Brodhead made clear to Heckscher that the Lois Trust was not a subject that Heckscher should or could inquire into on Henry's behalf.[24]

Although Heckscher is a skilled attorney in the trusts and estates area who could have demanded an explanation of Henry's exact standing under the Lois Trust, he did not do so. Moreover, he did not have a copy of the Lois Trust at that time and did not ask for one. These omissions are more understandable when viewed in the larger context. Heckscher was at that time working on Henry's behalf to cultivate good relations with the Trustees so as to enhance Henry's success in receiving increased distributions from the Henry Trust. Moreover, it was Family lore that the Lois Trust was "mother's trust" and so Brodhead's reaction was not particularly surprising.[25]

Thus, at a time when his Siblings—through their advisors—were part of the decisionmaking process that resulted in a profound change in distribution policy under the Lois Trust, Henry and his advisors were on the outside without information. While the Trustees blame this on Henry's own failure to kick in the door, it is obvious that the Trustees of the Lois Trust had no interest in giving him information about it.

This disparity in information came at a time when Henry was differently situated than his Siblings in some arguably material respects. Unlike his Siblings, Henry received nothing under Mr. McNeil, Sr.'s will. Henry also did not have another breadwinner in his household as his sisters did, nor did he have an income-generating career, as his brother Robert did. Indeed, during the time period in which distributions from the Lois Trust were suspended, Henry was actively seeking additional distributions from the Henry Trust. It is at least plausible, therefore, to think that Henry might have had an interest in receiving distributions from the Lois Trust, had he been aware that was possible.

For their part, the Trustees of the Lois Trust gave no consideration to the possibility that Henry or Henry's children should get distributions from the Lois Trust during Lois's lifetime. In general, the Trustees of the Lois Trust simply paid little attention to that Trust after the distributions to Lois stopped.

Their indifference to the Lois Trust was coupled with an accession to the desires of Lois that the Lois Trust remain invested almost exclusively in J & J stock. While the Trustees were aware that this was not a prudent approach to money management and disagreed with it as a matter of investment policy, Lois made it clear that she did not want the Lois Trust diversified. None of the Trustees was willing to incur what all the Siblings agree would have been the furious wrath of Lois by disagreeing with her in this regard. Lois took great pride in J & J and the capital appreciation it caused for the Lois Trust.

While this accession can be regarded in some senses as improper, it was also in

---

23. Tr. at 832; *see also* JX 61 (contemporaneous note of Heckscher reflecting Brodhead's statement written on Heckscher's copy of Brodhead's letter).

24. Tr. 834.

25. The letter sent to Henry by mistake makes no reference to the involvement of the Other Siblings in the change in distribution policy in the Lois Trust.

keeping with the deference the Trustees showed to the Siblings on their Sibling Trusts. Furthermore, because J & J was such a high-quality company with a proven track record of success, the Trustees' decision to hold the J & J stock and keep the Lois Trust almost exclusively invested in equities was more understandable, particularly given the other substantial assets that stood between the McNeil Family and a descent into the middle class.

The Family schism had another important effect on the Lois Trust. In October 1991, George Brodhead died an unexpected death. Thereafter, the Trustees initiated a very slow process to identify a successor. The Trustees' hope was that they could find a successor who would serve on all five Family Trusts. Within a week of Brodhead's death, Barbara McNeil (through her husband, Henry Jordan) raised the possibility that her friend, John Bennett, a partner at the law firm of Drinker, Biddle & Reath, be named as Brodhead's successor. Bennett was not only Barbara McNeil's friend, he was the law partner of her lawyer. He and/or his law firm had also performed legal work for Robert, Marjorie, and Claneil.

While the selection process persisted for almost two years, Bennett was eventually selected as Brodhead's replacement on every Family Trust, except the Henry Trust. In keeping with Henry's desires, Brodhead was replaced on the Henry Trust by Edward Bishop, an accomplished businessman and veteran fighter pilot who had been Henry's friend since college.

As to the other Family Trusts, however, the Family fault lines were preserved.

Bennett was acceptable to all the Other Siblings and to Lois, and was well qualified to serve as an effective Trustee. Given the Trustees' desire to be efficient and the joint approach they had already taken as to these Family Trusts, Bennett's selection made sense to them. Although Henry argues that the Trustees deferred blindly to the Siblings as to their desires for Brodhead's replacement on the Lois Trust, the inference I draw is subtly different. The Trustees looked to Lang Smith of Claneil and to a lesser extent the other Siblings for cues to how Lois felt about key issues. Having satisfied themselves that Bennett—who Lois knew and liked—was acceptable to Lois, it became an easy decision for the Trustees to go with Bennett.

Put differently, the primacy the Trustees gave to Lois's wishes as to the Lois Trust—when combined with the much closer business and financial planning relationship Lois had with the Other Siblings than with Henry—inexorably led to the selection of a common successor Trustee for the four Family Trusts other than the Henry Trust. That is, as to each Trust, the Trustees gave heavy weight to the named beneficiary's desires. Hence, Henry got Ed Bishop as his Trustee. But because Lois and the Other Siblings had a cohesive approach, her agreement to Bennett led to a situation where a close friend of Henry's sister Barbara became Henry's Trustee on the Lois Trust without Henry's input.[26]

### F. Henry Learns His True Status As A Current Beneficiary Of The Lois Trust

In the early 1990s, Henry continued to labor under the impression that he was a

---

**26.** Without delving into the issue deeply, I am convinced that the evidence supports the conclusion that the Trustees had a good faith basis to believe that Bennett was acceptable to Lois. This conclusion is supported by the testimony of Lois's own liaison to the Trustees, Lang Smith, as to her state of mind about that issue. Moreover, the record is clear that Lois was not afraid to voice her own views. If Bennett was unacceptable to her, she would have made that known in unmistakable terms.

remainderman of the Lois Trust. This impression was reinforced by the Trustees themselves. In 1992, for example, Scott Pickard of Wilmington Trust wrote Henry a letter proposing a reduction of the J & J holdings in the Henry Trust. Pickard explained the reasons for this proposal in part as follows:

> Our reasoning behind reducing this exposure to [J & J] in your particular trust was because your mother's trust has a substantial holding of [J & J], which she does not wish to sell, and, *more importantly, a quarter share passes to your trust at her death.*[27]

*All of the other Trustees received this communication. None corrected it.*[28] This erroneous communication could only have led Henry and his advisors to conclude that Henry was but a remainderman of the Lois Trust.

Another conversation between Henry's lawyer Heckscher and a Trustee reinforced this belief further. In the early 1990s during the process of finding a successor for Brodhead, Heckscher asked PNC's representative on the Lois Trust, Carl Werley, to tell him about the Lois Trust's relevance to Henry. Werley refused and made it clear that this subject was not a proper one for Henry to probe.[29]

In 1995, Henry retained another attorney, Todd Hayes, to assist in matters related to the Family Trusts. Hayes was a former Wilmington Trust employee but there is no record evidence that indicates that he had knowledge of the provisions of the Lois Trust as of the time he became Henry's lawyer. To cut through the fog surrounding the Lois Trust, Hayes wrote a December 6, 1995 letter requesting a copy of the Lois Trust on Henry's behalf, which stated in pertinent part as follows:

> Hank knows that his father established trusts similar to his for the benefit of is mother and is sisters and brother in 1959. Hank assumes his sisters' and brother's trusts are mirror images of his, and that his mother's trust "pours over" to her children's trusts upon her death, but he cannot be sure. He is generally aware that his father established other trusts in the early and mid–1970's, but he has never seen them. The uncertainty this creates makes it very difficult for Hank to plan his estate.
>
> Hank understands that his interests in these trusts are contingent and that, in Delaware, trust instruments are not typically made available, as a matter of right, to contingent beneficiaries. However, Hank believes that no one in his family would object and hopes that, in the interests of candor, the Trustees of the various trusts will be willing to share their terms with him.[30]

On December 28, 1995, the Trustees assented to Hayes' request and sent a copy of the Lois Trust. This is the first date on which Henry or his advisors had been given sufficient information from which to accurately assess his status as a current beneficiary of the Lois Trust.

Although the Trustees did provide Henry with a copy of the Lois Trust, they did not offer to meet with him regarding that Trust and continued to provide information about that Trust to his Siblings that he did not receive. For his part, Henry did not press the matter at that time, perhaps because he was, as we shall see, more focused on the Henry Trust at the time.

---

27. JX 80.

28. *Id.*

29. Tr. 834.

30. JX 130.

### G. *Henry's Struggle With The Trustees Of The Henry Trust And With His Own Children*

Henry's request for a copy of the Lois Trust coincided with Henry's frustration over the handling of his request for a large principal distribution from the Henry Trust. All in all, this was a very trying and frustrating period for Henry and for the Henry Trustees. Henry's concerns resulted in separate litigation in this court, that was resolved after a full trial.[31]

Without delving into the details of that related dispute, a few key facts are important. First, it was Henry's position that the Trustees of the Henry Trust were duty bound to consider Henry's interests as paramount over the interests of other beneficiaries of that Trust. In particular, Henry asserted that the interests of his own children were more in the nature of remaindermen than current beneficiaries. This assertion was consistent with what Henry had been led to believe, comported with what his Siblings believed about how their own Trusts worked, and was in keeping with the Trustees' treatment of Henry under the Lois Trust.

Second, it became apparent that Henry's by-then adult children, Cameron and Justin, were not as affluent as Henry and the Henry Trustees imagined. Regrettably, it was also clear that Cameron and Justin harbored deep animosity towards their father and that they did not trust him to protect their economic interests.[32] They therefore opposed Henry's desires for a large principal request from the Henry Trust once they were contacted by the Trustees.

Third, the Trustees' failure to inform Cameron and Justin earlier about their current beneficiary status appears to have pervaded their administration of all the Family Trusts. Apparently, the Trustees had relied upon the Siblings to deal with their own children, with little or no effort on the part of the Trustees themselves to inform beneficiaries of their status. Because Henry had the first children of the next generation to reach majority and because he had a strained relationship with his children, the Henry Trust happened to be the one in which a problem first arose. But this was an omission waiting to turn into a problem. The beneficiaries of the Henry Trust were the unfortunate ones to be directly affected by it.

Finally, the Trustees of the Henry Trust resolved the conflict between Henry and his adult children in a way that can be seen as inconsistent with their prior approach. Rather than bend to Henry's will, the Henry Trustees eventually came up with a unitrust formula under which Henry received substantial distributions but so did Cameron and Justin. That is, the Henry Trustees recognized that Cameron and Justin were current beneficiaries with real needs and desires and deployed assets of the Henry Trust to meet their ends. Unitrust distributions were thus split 60% to Henry, 20% to Cameron, and 20% to Justin. Cameron and Justin were also given "make-up" distributions because of the Henry Trustees' failure to inform them earlier of their status.

This resolution was the culmination of a torturous process during which the Trustees came to have a much different appreciation of the reality of what the Trust Instruments said than they had before. This appreciation manifested itself in decisions that were far more deeply considered than had characterized the actions of the Trustees of the Lois Trust. The Trustees of the

---

31. *See Bishop.* mem. op., *passim.*

32. The reasons for this animosity and lack of trust are not germane to this case.

Lois Trust had largely bent to the will of Lois, without any consideration of other named beneficiaries. The decision of the Trustees of the Henry Trust to take account of the interests of the next generation of McNeils in many ways began a new era of transition for all the McNeil Family Trusts.

### H. *The Value Of The Lois Trust Increases Enormously From 1987 To 1997*

During the period during which distributions from the Lois Trust ceased, the value of the Trust principal soared. From December 31, 1987 to December 31, 1997, the Lois Trust grew from $32,647,014 to $230,235,724. This growth largely tracked J & J's market performance.

### I. *Henry Makes A Distribution Request From The Lois Trust*

By early January 1997, Henry's frustrations were running high. Stymied in his efforts to obtain as large a distribution as he wished from the Henry Trust and upset at the Trustees' decision to make substantial distributions to Cameron and Justin, Henry filed suit against the Trustees of that Trust.

A month later, he sent a letter to the Trustees of the Lois Trust, which stated as follows:

> I am writing to seek information and to request a distribution from the Trust my father established for his children and his wife.
>
> I had always thought the Trust we referred to as "Mother's" was for her benefit alone, indeed I was led to believe it

was structured the same as mine. I recently found out that I am one of the primary beneficiaries of the "Deed of Trust for Lois Fernley McNeil and Others". It provides that the Trustees may distribute "any part or all of the income and principal of the Trust to or among my lineal descendents and their spouses, and Lois." I have been wondering why I was not told this earlier and why no distributions have been made to date. I would appreciate an update on the history and current status of that Trust.

> I can understand it would be imprudent estate planning for any funds from this Trust to go to my mother. However, I am at a stage of my life when a substantial distribution would be appropriate. As you know, I am engaged in several important endeavors, including the land reclamation business and my significant art collection.
>
> Accordingly I would like to immediately begin receiving one fourth (1/4) of the income of the Trust and a principal distribution of ten percent (10%) of Trust principal. *In light of the fact that two of you have made a commitment to a distribution from my Trust to my children (who are not primary beneficiaries of my Trust), a distribution to me from this Family Trust (of which I am a primary beneficiary) is certainly warranted.*
>
> Keeping in mind that all three of you are acquainted with the other family Trusts and the Claneil documents, it is important at this point in my life that my father's comprehensive plan, which includes these Trusts, be implemented accordingly.[33]

---

33. JX 158. As the Trustees point out, Henry admitted that he did not make a request from the Lois Trust earlier because he believed that it was intended to benefit his mother during her lifetime. Tr. at 522. It was not until Henry was disabused of the notion that the Henry Trust was intended as his during his lifetime that he realized that the logic of the Henry Trustees would be consistent with a distribution to him from the Lois Trust.

Henry also seized on the wording of Article II(a) of the Lois Trust to draw the erroneous

In reaction, the Lois Trustees first informed the other Siblings of Henry's distribution request and of the Trustees' intention to "consider distribution policies with respect to the [Lois] [T]rust in due course." [34] The Lois Trustees did not, however, inform Lois of Henry's request. Nor did his Siblings or Lang Smith. All agreed that it would upset Lois to learn that Henry had sought a distribution from what Lois regarded as "her" Trust.[35] Apparently, the Lois Trustees, the Other Siblings, and Smith decided to inform Lois only if the prospect of a distribution to Henry seemed likely.

On March 6, 1997, Henry again wrote the Lois Trustees, noting their failure to provide him with any response to his earlier request for information and distributions. He pointed out that he had never been given information about the Lois Trust since its inception, despite his status as a current beneficiary.[36]

On March 14, 1997, the Lois Trustees sent Henry a current list of assets in the Lois Trust, hoping that the list was a "sufficient response" to Henry's request for information.[37] The Trustees promised to contact Henry if they needed more information regarding his distribution request.

Henry was not satisfied with this response and demanded more information on March 26, 1997.[38] On April 16, 1997, Henry wrote the Lois Trustees and expounded on his distribution request. He stressed the fact that he was at a point in his life when he had many projects in the works and could use funds for worthy purposes. Most significantly, he stressed the enormous value of the Lois Trust and the apparent inconsistency in approach being taken in that Trust compared to the Henry Trust:

> Since Peter [Mather] and Linda [Manfredonia of PNC] are also trustees of the [Henry] trust set up by my father primarily for my benefit, at least two of you are aware of what is happening there; I don't know if John is. What is relevant is that the trustees have eliminated any principal distributions to me from that trust for the time being, and have elected to make principal and income distributions to my children.

> You have said that this trust has assets of nearly $214,000,000, with income of approximately $2,300,000 per year. Despite this, no distributions have ever been made from principal to anyone. *Even though the trust is for the benefit of "Lois McNeil and Others," my mother has been the only person to benefit, which is inconsistent with the position Peter and Linda have taken in my trust. I don't believe my father intended that this trust sit there year after year without providing significant benefit to my mother, me or any of my siblings. As trustees, what is your plan for distributing this trust?*

> \* \* \*

conclusion that the Siblings' interests in the Lois Trust were somehow stronger than the interests of the Siblings' children in the Sibling Trusts. That is, Henry argued that the fact the Siblings were mentioned before Lois in Article II(a) of the Lois Trust was of material importance, despite the title of the Lois Trust.

34. JX 161.

35. That is, they thought Lois would act as Henry did when the Trustees of the Henry Trust began to involve Cameron and Justin as a factor in their decisions.

36. JX 162.

37. JX 167.

38. JX 169.

I believe my father intended the funds he put in trust for his family to be available for much broader use than merely holding marketable securities untouched to benefit future generations. Given the family history, I believe he intended, among other things, that funds be available for development of . . . projects by his children.[39]

### J. The Trustees Propose A Division Of The Lois Trust Into Four Equal Parts

On April 21, 1997, the Trustees of the Lois Trust wrote Lois, all the Siblings (including Henry), and Henry's adult children to inform them that the Trustees were considering dividing the Lois Trust into four "Resulting Trusts" (the "Equal Division"), one for each Sibling's Branch of the McNeil Family. The Trustees cited two benefits to the Equal Division:

First, since the branches of the McNeil family have different financial needs and/or desires, if the Lois Trust were divided the Trustees of each divided trust could focus on the needs and desires of the members of that branch in making determinations whether to distribute income and/or principal.

Second, the investment policies of each divided trust could be adapted to take into account the different needs and desires of the member of that branch. At present, approximately 90% of the Lois Trust consists of Johnson & Johnson common stock, which has been an excellent holding since the trust's inception in 1959. However, some family members might prefer greater diversification, which, while entailing capital gain taxes, might over the long term produce greater current income and greater safety of principal, while other family members

might be content to continue the concentrated investment in Johnson & Johnson common stock.[40]

The Trustees said that they would like to implement the Equal Division, subject to approval by this court and to the attainment of an IRS ruling that the Division would not endanger the Trust asset's exemption from the GST. In the interim, the Trustees proposed to make a distribution of $600,000 per Branch.

Henry was not unalterably opposed to the Equal Division, but made it clear that such a division would only be acceptable if trustees agreeable to him were appointed to govern his Branch's Resulting Trust. He also continued to protest the Trustees' refusal to make distributions to him, however, given their knowledge of the projects for which he sought capital.

Henry's unhappiness ripened into litigation against the Lois Trustees in August 1997. Thereafter, he received $400,000 of the $600,000 initial distribution the Lois Trustees made to his branch from the Lois Trust; his adult children, Cameron and Justin, received $100,000 each. The other branches of the McNeil Family also received $600,000 in distributions, but these distributions were generally allocated as the Sibling at the head of the branch desired. In Henry's case, the Trustees followed the allocation split agreed to by the Trustees of the Henry Trust, a split that was not pleasing to Henry.

### K. Lois Dies And Does Not Exercise A Power Of Appointment In Henry's Favor

On March 4, 1998, Lois died. In her will, she did not exercise a power of appointment in favor of Henry, but instead left him $2 million. While that is a sub-

---

**39.** JX 171.

**40.** JX 172.

stantial sum of money to most people, it was miniscule in comparison to the enormous wealth left to the Other Siblings, who each received an equal share of the Marital Trust.

This development came as a blow to Henry, both emotionally and financially. He felt that he had repaired his relationship with his mother and had been led to believe that he would be restored to a position roughly equal to the Other Siblings.

His mother's testamentary decision also led Henry to oppose the Equal Division. Thus, his counsel informed the Trustees that any division would have to take into account the material disparity between the wealth of Henry's Branch and the other Branches.[41]

## L. *The Trustees Come Up With A More Concrete Plan To Divide The Trust*

Since that news, events in the Lois Trust have taken a predictable, if tense, pattern. Henry desired large capital distributions to fund his projects—principally involving the collection of art, the development of an interesting reclamation project in New Jersey that also has artistic components, and the renovation of a famous house in Philadelphia—and to make up for what he saw as years of neglect by the Lois Trustees.

The Lois Trustees opted instead for distributions in equal parts to the various Branches, that in Henry's case would follow the allocation formula used in the Henry Trust. Most of all, the Lois Trustees continued to press forward with plans for the Equal Division of the Lois Trust, even after suffering the body-blow of an initial adverse ruling by the IRS.

In the interim, a few key developments occurred. John Bennett decided to resign as Trustee of the Lois Trust. Recognizing that Henry would never concede that Bennett could be objective and impartial, Bennett stepped aside in the summer of 1999. He was replaced by Shaun O'Malley, the former Chairman of PriceWaterhouse-Cooper.

During the same period, the Lois Trustees adopted a "unitrust" method of distribution. Under that method, the Lois Trust pays out a percentage of its total value each year, consisting of both principal and income. By this method, it is hoped that the interests of current beneficiaries in a healthy income stream and the interests of future beneficiaries can be aligned. By distributing regular amounts of principal, the Trustees can ensure adequate income while shifting the investment mix towards faster-growing equities that produce less income than fixed-income securities.

On September 9, 1999, the Trustees formalized their decision to adopt a unitrust policy. They agreed that they would annually distribute 5% of the Lois Trust's fair market value for the average of the three preceding calendar years (the "Unitrust Policy"). Because the Lois Trust exceeded $300 million in value at the time, this policy was expected to generate per-branch distributions of approximately $4 million annually.

Because the Trustees believed that the 5% unitrust distributions were quite generous—especially in view of the distributions that were also being paid to the Siblings out of the Sibling Trusts—the Trustees coupled the Unitrust Policy with a caveat:

*Additional Principal Distributions:* Implementation of the total return trust plan will not foreclose the possibility of

---

**41.** JX 326.

principal distributions being made to one or more eligible beneficiaries in addition to the total return trust distribution amount. However, it is anticipated that, since implementation of the total return distribution plan will result in substantial principal distributions being made to trust beneficiaries, principal distributions in addition to the total return trust distribution amount may be considered only for extraordinary and special items.[42]

Henry was not satisfied. He pressed the Trustees to make distributions to him in order to fund purchases of valuable pieces of art and his other projects. The Lois Trustees invariably denied these requests as not meeting the high standard they had set to govern requests for principal distributions in excess of the unitrust payout. The Trustees did not delve into the artistic merits or the bargain nature of the art that Henry wished to purchase, they simply concluded that his desire to buy particular pieces did not amount to a special or extraordinary circumstance meriting an extra distribution. In his deposition, Mather admitted that he had difficulty conceiving that any request to purchase art would meet the standard set forth in the Trustees' policy, which he felt was more appropriately met by requests to fund serious medical procedures or a primary McNeil-style residence. Henry, however, also did not buttress his requests with an explanation of why he could not finance his art purchases and projects with the distributions and resources already available to him.

Henry's disgruntlement had another aspect: he also wanted a "makeup" distribution from the Lois Trust. As noted, the Trustees of the Henry Trust had made a make-up distribution to Cameron and Justin to rectify their failure to inform Camer-

on and Justin of their current beneficiary status in a timely manner. Henry argued that the Lois Trust should make a similar distribution to him because he had been wrongly kept in the dark by the Trustees since 1969 about his current beneficiary status. The Lois Trustees did not accede to his request for a make-up distribution.

### M. The Trustees Submit A Request For IRS Approval Of The Equal Division

Despite having received discouraging news from the IRS initially about the prospects of a favorable ruling on the Equal Division, counsel for the Lois Trustees and the beneficiaries (in particular, Henry's tax counsel) came to the conclusion that the split could nonetheless still be blessed by the IRS. On April 27, 2000, the Trustees resolved to resubmit an opinion request to the IRS.

The Trustees have (through counsel) assured the court that it is their firm intention to divide the Lois Trust four ways along Branch lines. In the wake of objections from Cameron and Justin about the possible adverse effects a four way split could have on them, however, the Lois Trustees are committed to exploring post-Division options to address Cameron's and Justin's concerns.

### N. The Lois Trust Grows Even More From 1997 To The Time Of Trial

As of June 30, 2000, the Lois Trust had grown to $317,592,644 from its $230,235,724 value at the end of 1997. This growth continued to largely track J & J's performance during a bull market.

### O. Wilmington Trust Resigns As Administrative Trustee

At the end of 2000, Wilmington Trust stepped down as Administrative Trustee of

---

42. JX 232.

the Family Trusts. It was replaced in this capacity by PNC's Delaware subsidiary. As a result, the current complement of Lois Trustees is comprised of Mather, O'Malley, and PNC (Pennsylvania) as General Trustees and PNC (Delaware) as administrative Trustee. In reality, PNC's Pennsylvania and Delaware trust operations are under unified management.

## II. The Parties' Various Contentions

Henry's demands for relief are several:

- The removal of the Trustees of the Lois Trust and their replacement with impartial Trustees because the Trustees' allegedly breached their fiduciary duties by failing to inform Henry of his interest in the Lois Trust and by discriminating against him in favor of the Other Siblings.
- A substantial make-up distribution to himself to rectify the Trustees' failure to make distributions to him earlier in his life.
- In the alternative, an order increasing the unitrust payout to a higher percentage than 5% for the same purpose and to ensure fair treatment of living beneficiaries.
- A declaration that the Trust can be divided into four separate trusts by branch, but in proportions that take into account the relative economic positions of the various branches by allocating a higher proportion to Henry's branch.
- Invalidation of the portion of the Trustees' Unitrust Policy that additional principal distributions be made only for extraordinary or special items.
- A surcharge of the Trustees for their breaches of fiduciary duty.
- An award of his fees and costs in this action.

The Trustees oppose all the relief Henry seeks and desire a declaration that their actions were proper, that the proposed Equal Division is appropriate, and that the five percent Unitrust Policy is permissible. The Other Siblings support the Trustees' position and oppose Henry's request for relief.

Cameron and Justin oppose the Equal Division but otherwise support the position of the Trustees. The guardian *ad litem* who represents the unborn beneficiaries of the Lois Trust also opposes the Equal Division, but otherwise supports the position of the Trustees.

## III. Legal Analysis

### A. The General Standards Governing The Court's Review Of The Action Of The Trustees

In the earlier case involving the Henry Trust, the court stressed the broad discretion afforded the Trustees by the Trust Instrument and the concomitant limitations that placed on the court's review. The court's prior statements apply with equal force to this case:

> Article 2(a) of the [Lois] Trust accords the Trustees broad discretion to make or not make distributions.... I cannot upset the judgment of the [Lois] Trustees in exercising their discretion under Article 2(a) unless I find that they "acted in bad faith or in an arbitrary or unreasonable manner." *In re Couch Trust*, Del.Ch., 723 A.2d 376, 382–383 (1998). Any more intrusive form of review would be contrary to Mr. McNeil, Sr.'s patent desire to free the Trustees from judicial scrutiny to the extent legally permissible. [LT], Art. 3(e) (decisions of the Trustees shall not be "subject to review by any court"); [LT], Art. 4(c) (providing that all good faith acts of the Trustees "shall be proper" and absolving the Trustees of liability except in

cases of "gross negligence" or "willful wrongdoing").

Even under this deferential standard of review, the Trustees can be found to have abused their wide discretion if they failed to carry out the settlor's intent, *Dickinson v. Wilmington Trust Co.*, Del. Ch., C.A. No. 15605, [734 A.2d 605], 1999 WL 66530, at *4, Lamb, V.C. (Feb. 5, 1999) *aff'd, Wilmington Trust Co. v. Dickinson*, Del.Supr., No. 68,1999, 734 A.2d 642, 1999 Del.Lexis 219, 1999 WL 591864 (July 14, 1999), as reflected in the language of the Trust instrument. *In re Couch Trust*, 723 A.2d at 382.[43]

■ The present case is complicated by the fact that all of the past, present, and proposed distributional and investment decisions of the Lois Trustees could have been made consistently with the terms of the Trust Instrument, *had those decisions resulted from a sufficiently informed and impartial decisionmaking process.*[44] That is, the law is clear that the fact that a trust instrument provides discretion to trustees does not vest in the trustees unfettered authority to act in any manner they see fit. In deciding this case, I am mindful of the protections Mr. McNeil, Sr. gave to his Trustees.

Therefore, my review of the actions of the Lois Trustees is heavily influenced by a reluctance to interfere with their decisions, unless there is evidence that they acted in a manner that cannot be written off as mere inadvertence or a simple mistake. To that end, I have scrutinized the record to determine whether the Lois Trustees committed breaches of their fiduciary duties that were persistent and in conflict with obvious principles of proper trust administration. In particular, I have focussed on whether the Lois Trustees engaged in a long-standing pattern of improper behavior that rises to the level of gross negligence.

B. *The Trustees Breached Their Fiduciary Duties By Failing To Inform Henry Of His Status Under The Lois Trust And By Providing The Other Siblings With Materially Greater Access To Information And Influence Over Lois Trust Decisions*

■ The Lois Trustees concede that they had the duty to inform adult beneficiaries of their status. Despite the overwhelming evidence that they did not discharge this obligation to Henry for *several decades*, however, the Lois Trustees claim that they did not breach their duties because Henry should have been able to discern (or press harder to learn) his status, and because he was not harmed in any way by any lack of earlier knowledge. Neither of these defenses is persuasive.

The Lois Trustees had an affirmative obligation to inform Henry of his status in an accurate and balanced way.[45] Their

---

**43.** *Bishop,* mem. op. at 44–45.

**44.** *Id.* at 50 ("Although the Trustees have the discretion to deny any Current Beneficiary distributions from the Trust, that discretion must be exercised in an informed and impartial manner.") (*citing* Restatement (Third) of Trusts § 187 cmt. h & § 183 (1992)); *In re Miller's Estate,* 230 Cal.App.2d 888, 41 Cal. Rptr. 410, 422 (1964) ("It is obvious that the discretion given to a trustee is never unlimited or arbitrary, such as might be exercised by an oriental prince out of Arabian Nights, sitting at the city gate and exercising his own uncontrolled whim as to what is appropriate and just.").

**45.** George Gleason Bogert, *Trusts and Trustees* § 961 (2d ed.1983) (a "trustee is under a duty to notify the beneficiary of the existence of the trust so that he may exercise his rights to secure information about trust matters ...."); *Bishop,* mem. op. at 66 n. 23 (faulting Henry Trustees for not notifying Cameron and Justin of their rights); *Eddy v. Colonial Life Ins. Co. of America,* 919 F.2d 747, 752 (D.C.Cir.1990) (emphasizing that it is the trustee who bears the burden to provide ma-

attempt to blame the beneficiary for his lack of understanding is regrettable, rather than exculpating. The evidence is clear that all the Siblings misunderstood the Family Trusts. The Lois Trustees contributed to this. Most egregiously, however, the Lois Trustees—through Brodhead—provided the Other Siblings with a letter that gave them an accurate portrayal of the terms of the Family Trusts, but excluded Henry from this communication. Brodhead's act was blatantly partial and improper.[46]

Because Brodhead played such a dominant role from the inception of the Trusts' activation until his death, it is unsurprising that the remaining Trustees claim that they believed that Henry had been told about the terms of the Lois Trust at an earlier time. The problems with this defense are several, however. First, there is no evidence that any of the other Lois Trustees ever inquired whether Henry in fact had received such an explanation. Any assumption the other Trustees made in this regard was wholly uninformed.

Second, the other Trustees cannot claim absolution simply because they let Brodhead run the show. During Mather's and PNC's tenure, Brodhead told Henry's lawyer that the Lois Trust was no concern of Henry's. Given the way the Trustees operated, one can infer that the other Trustees were told that Brodhead had given Henry this message or had delegated to Brodhead the authority to speak on their behalf on such matters without reporting back. In either event, they remain re-

sponsible. Furthermore, in the early 1990s, PNC reiterated the same "butt out" message to Henry's advisor that Brodhead had earlier conveyed.

Finally, not only did the Trustees not inform Henry of his status, they affirmatively misinformed him of his status. Wilmington Trust wrote him a letter in 1992 clearly implying that the Henry Trust held a remainder interest in the Lois Trust. This was incorrect, yet neither PNC, Wilmington Trust, nor Mather corrected it. As a consequence of these largely undisputed facts, I conclude that the Lois Trustees breached their fiduciary duties by failing to inform Henry of his status as an eligible current beneficiary.

Likewise, I conclude that the Lois Trustees breached their fiduciary duties by failing to give impartial consideration to his interests. Although I do not believe that the Trustees (other than perhaps Brodhead) harbored any desire to discriminate against Henry, they clearly did so in practice. However unthinking it was, the decision of the Lois Trustees to combine their meetings with Lois and the Other Siblings necessarily provided the Other Siblings with greater access to information and influence regarding the Lois Trust.

I largely credit the testimony that indicates that the combined meetings conveyed little that was Lois Trust-specific. But that is not quite the point. The reality is that the Other Siblings got summaries of the meetings that the Lois Trustees

---

terial information to the beneficiary and that the beneficiary does not "have a duty to try and try again until he receive[s] correct and complete information"); *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir.1993) (holding that once a beneficiary has requested information from a trustee, the trustee "has an obligation to convey complete and accurate

information material to the beneficiary's circumstance").

**46.** *DuPont v. Delaware Trust Co.,* Del.Supr., 320 A.2d 694, 699 (1974) ("It is axiomatic that where there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them."); *see also Bishop,* mem. op. at 50 (same principle).

held—Henry did not.[47] The Other Siblings got to hear their mother or her representative interact with the Lois Trustees about its holdings—Henry did not.

Most of all, the Other Siblings had input into the Lois Trustees' decisions to cease distributions in 1987. As Henry reasonably points out, the fact that Lois did not need distributions in 1987 did not necessarily make it good policy for the Lois Trustees to turn off the spigot entirely. While that might have seemed wise to the Other Siblings who were wealthier than Henry, his advisors might have suggested that at least some distributions continue but be made to the Siblings, rather than Lois. Although the Other Siblings did not take distributions for themselves, they and not Henry got to participate in the decisionmaking process.[48]

The fact that this differential arose out of a family divide that the Lois Trustees did not create does not excuse the Lois Trustees' acceptance of it as a working principle for the Lois Trust. By treating the Other Siblings in a preferred manner, the Lois Trustees did not act impartially and breached their fiduciary duties. By blinding themselves to any consideration of Henry's Branch for a period of at least a full decade, they failed to take material facts into account and simply let the Lois Trust operate on autopilot.[49] Put differently, the Lois Trustees acted with a combination of total deference to Lois, discernable partiality to the Other Siblings, and indifference to Henry that cannot be considered a reasoned exercise of discretionary power. *The fact that the Lois Trustees might have properly decided to choose the same course of action had they engaged in an unbiased and adequately informed process does not excuse how they went about reaching this course of action.*

Henry seeks various forms of relief for these breaches. Notably, Henry seeks a make-up distribution, the surcharge and removal of the Lois Trustees, and an award of his attorneys' fees and costs. The question of what relief, if any, is appropriate for these breaches is an interesting one that will be considered later in this opinion, after addressing Henry's challenge to the Equal Division and the Unitrust Policy of the Lois Trustees.

## C. *Did The Trustees Abuse Their Discretion By Proposing An Equal Division Of The Lois Trust?*

■ Henry argues that it was improper for the Trustees to agree to the Equal Division, given the unequal wealth of the McNeil Family branches. He also notes that the proposal for the Equal Division came shortly after his first request for a distribution and was thus a defensive reaction rather than a careful decision.

On the latter point, I agree with Henry's view that the Equal Division proposal likely resulted directly from his request for a distribution. Henry's request shook the Lois Trustees out of a ten-year slumber during which they simply let the Lois

---

47. This discrimination continued even after the filing of this suit.

48. *Disher v. Fulgoni*, 161 Ill.App.3d 1, 112 Ill.Dec. 949, 514 N.E.2d 767, 775–76 (1987) (where trustees of a voting trust consulted with all but one beneficiary in amending the trust and making an early distribution, the trustees breached their fiduciary duty of loyalty and impartiality to the excluded beneficiary).

49. *Cf. In re Miller's Estate,* 41 Cal.Rptr. at 424 ("the general rule giving a trustee sole or absolute discretion does not apply where a trustee has not exercised discretion at all") (*citing, inter alia,* Restatement (Second) of Trusts § 187 & Scott on Trusts § 187.3, at 1389–90 (2d ed.)).

Trust operate without active supervision. There is no convincing evidence that supports the notion that the Lois Trustees were actively doing anything with regard to the Lois Trust until Henry woke them up.

The origin of their decision to divide the Lois Trust, however, is not dispositive of its propriety. The proposal was a quite rational reaction to the reality that four different families with different needs and desires would soon be receiving distributions from one trust. It clearly will be easier for the Trustees to focus on the particular needs of each Branch if each Branch has its own corpus. The Division will make it possible for the Trustees to adapt investment and distribution policies more precisely, with less fear that alterations advisable for some beneficiaries will have an undue effect on others.

Nor is it improper for the Trustees to propose an Equal Division. Although the Lois Trustees could propose a different allocational scheme, they are not bound to do so. Their decision to divide the Lois Trust by Branch is a permissible one, even in view of the economic inequalities among the Branches. The Trustees had no duty to remedy the economic discrimination worked on Henry and his children by the wills of Henry's parents through a compensatory act of discrimination of their own against the other Branches. In the context of the McNeil Family Trusts, the desirability of overall economic inequality might also be given less weight due to the fact that the Trustees were aware that Henry's Branch, although less wealthy than the Other Branches, is still rich. An Equal Division leaves Henry and his offspring with Trusts totalling over $150 million. Although this is far less than the wealth of the other Branches, it would be passing strange to require trustees to apply an unyielding leveling principle to equalize the wealth of well-healed trust beneficiaries in a society that tolerates pervasive economic inequality in far more troubling circumstances. Therefore, I reject Henry's challenge to the Equal Division of the Lois Trust.

The Equal Division is also opposed by Cameron and Justin, as well as the guardian *ad litem*. Their major argument in opposition is a bit odd. They fear that the Resulting Trust for each Branch will be susceptible to too much influence from the Sibling who is the current head of the Branch, and that the Siblings might advantage themselves at the expense of other beneficiaries. There is, I suppose, some logic to this argument.

But one must remember that the other beneficiaries and future generations only have access to this wealth because they are the biological offspring of the Siblings. It is unrealistic to think that the born and unborn McNeil Family children—in contrast to other children in our society—can be completely protected from their parents. Although the history between Henry and his adult children is a troubled and unfortunate one, that history also shows that the Sibling Trust form provides substantial protection to the children and later descendants of the Siblings. The Equal Division will not deprive the beneficiaries of the Lois Trust of protection from Trustees. The Resulting Trust of each Branch will be governed by Trustees who must act impartially towards all beneficiaries. The Lois Trustees were entitled to think this protection adequate.

What the Equal Division does accomplish is to confine disputes to one Branch of the Family at a time, which is a material benefit in itself. Given that each Branch will have a Sibling Trust and a Resulting Trust worth over $150 million combined, there is plenty of net between the next generations of each Branch and penury.

The Lois Trustees' belief that any benefits from retaining the possibility of differential distributions to the Branches out of the Lois Trust are outweighed by the costs of leaving the four Branches of McNeils as beneficiaries of one, increasingly unwieldy trust is a reasonable one, especially because each Branch has such a healthy economic cushion.

Finally, I reject the guardian *ad litem's* contention that the Equal Division is at odds with some implicit intent of Mr. McNeil, Sr. The Equal Division is clearly a decision within the power granted to the Lois Trustees.[50] In the sound exercise of their discretion, the Lois Trustees could give all of the Lois Trust to a McNeil who was developing a cure for cancer, for example.[51] The Lois Trustees have the power to create further trusts and to terminate the Lois Trust.[52] Their decision to divide the Trust fulfills Mr. McNeil, Sr.'s desires by ensuring that each Branch has substantial resources and is benefited by the GST exemption, while providing a structure that permits the Trustees to tailor their administration more precisely to the circumstances of the beneficiaries within each Branch.

D. *The Trustees' Decision To Adopt A 5% Unitrust Formula And To Limit Other Principal Distributions Was Permissible*

■ Henry challenges the 5% Unitrust Policy on the grounds that it unduly favors future beneficiaries over current beneficiaries. In support of this argument, he claims that a unitrust distribution formula

as high as 7% would likely retain the real economic value of the Lois Trust's principal. Citing to testimony by the Trustees' own witnesses that a goal of preserving the real purchasing power of the trust is a sound way to balance the interests of various generations,[53] Henry therefore claims that the Trustees have abused their discretion by selecting a payout formula that will likely increase the real value of the trust corpus.

Henry, however, ignores the fact that it is appropriate for the Trustees to pick a percentage that will ensure that the Trust principal retains its real value on a more consistent basis. While the 7% payout figure that Henry desires might result in a retention of the real value of the Trust principal by the end of the Trust in or around 2060, that figure also is statistically likely to produce periods during which the real value of the Trust principal will be less than it is now. That payout formula also assumes that the Lois Trust will continue to be invested almost entirely in equities,[54] when it is the Trustees' prudent and permissible intention to diversify the portfolio by adding investments of a more stable character.[55] Furthermore, Henry disregards the fact that in the future there will more McNeil mouths to feed than currently. The decision of the Trustees to select a unitrust figure that is more conservative than he desires is therefore rational, even *if it might result in an increase* in the real value of the Trust principal. The Trust Instrument gives the Trustees the authority to make precisely this sort of investment choice.[56]

---

50. LT, Art. II.

51. *Id.*

52. *Id.*

53. Tr. 988–89.

54. Tr. 1141, 1163.

55. *Gans v. MDR Liquidating Corp.*, Del.Ch., C.A. No. 9630, 1991 WL 114514, at *5, Hartnett, V.C. (June 25, 1991) ("As a general rule, a trustee has a duty to diversify trust assets.")

56. LT, Art. III.

Furthermore, reliable expert testimony indicates that the 5% unitrust figure selected by the Trustees is at the high end of what most trust experts believe is prudent in view of historical market patterns, and may well result in a decline in the real value of the Lois Trust corpus over time.[57] While trustees too often have avoided policies that allow responsible investments in equities, the unitrust principle's emergence in the industry reflects a new approach that allows more growth while increasing distributions to current beneficiaries. The 5% figure provides a healthy flow of distributions to current beneficiaries, is likely to retain the current real value of the Trust, and will expose the Trust to less volatility than a larger payout.

Similarly, the Trustees' decision to couple the 5% unitrust formula with a general policy against other principal distributions, except in extraordinary situations, was not an abuse of discretion. By its very design, the unitrust approach results in the distribution of principal on a regular basis. By selecting a fairly aggressive payout formula, the Lois Trustees were already attempting to maximize distributions to the current beneficiaries. In these circumstances, it made sense for them to put the beneficiaries on notice that they were expected, as a general matter, to utilize the unitrust distributions to meet their needs. Given that the unitrust distributions to each Branch from the Lois Trust alone approach $4 million annually, this was hardly unreasonable.

Henry appears to believe that the Trustees have abdicated their obligations to consider individual principal distribution requests. I conclude that they have not done so either in theory or in practice. I am persuaded that the Trustees will invade principal if necessary to accomplish some important end of a beneficiary (e.g., the purchase of a principal residence of McNeil Family quality) that cannot be satisfied out of the other distributions the beneficiary regularly receives. The fact that the Trustees have rejected Henry's requests to date does not mean that they will not grant one when he makes a sufficient showing. In none of Henry's recent requests has he made an attempt to demonstrate why the assets he possessed and the distributions he was already receiving were inadequate to allow him to accomplish his stated objectives. That his desires are to purchase valuable art that has earned critical respect in certain art circles does not entitle him to limitless distributions for that purpose, especially when he has not even shown that he cannot fulfill his ends through his other substantial means.[58]

As a result, I reject Henry's challenge to the 5% Unitrust Policy.

### E. What Is The Appropriate Remedy For The Fiduciary Breaches Henry Has Demonstrated?

The most difficult question in this case is what to do about the Lois Trustees' failure to live up to their fiduciary duties to Henry for a lengthy period of time—most notably, the period between 1987 and 1997. All of the other parties join forces with the Lois Trustees in urging upon me the proposition that Henry was not harmed by any

---

57. See, e.g., JX 339, at 20 (report of Robert Wolf); JX 419, at 25 (report of Burton G. Malkiel).

58. At trial, Henry was asked what he had done with the $20 million in distributions he had received since 1998. Although one would not expect that Henry would be able to answer that question with the accuracy of an accountant, his lack of specificity was striking. He could not even identify his expenditures by categories to the nearest million, much less in greater detail.

breach that occurred. Had Henry been informed of his status, Henry (they assert) would not have done anything differently because he would have believed it wrong to make a request from "mother's trust" and would not have wanted to incur his mother's ire, since he still hoped to be included as a beneficiary of a power of appointment in her will. Moreover, because Lois stopped taking distributions out of the Lois Trust and began living off the Marital Trust, this had the effect of diminishing the Marital Trust (in which Henry was to have no interest) to the benefit of the Lois Trust (in which his Branch was a full beneficiary). Likewise, although Henry complains that the Lois Trustees abdicated their decisionmaking power over investments to Lois, their deference to Lois's bet paid off because J & J grew enormously, thus enriching rather than impoverishing Henry. Finally, the Lois Trustees and other parties emphasize that Henry lived the life of a wealthy man during the period in which he was kept in the dark about the Lois Trust. Although he had unfulfilled desires, he did not have unmet needs. This factor, they say, must be taken into account in deciding whether a remedy is due.

Henry, however, points out that for a period of a full decade the Lois Trustees simply let the Lois Trust grow without any consideration of his interests at all. As a result, the Lois Trustees—through an act of deference to Lois and the advisors of the Other Siblings—thoughtlessly favored the interests of future generations of the Lois Trust over Henry and other living beneficiaries who could have benefited from distributions during that period.

Keeping these basic arguments in mind, I turn to Henry's request for a remedy, starting with his request for a make-up distribution.

### 1. A Modest Make–Up Distribution Is A Fitting Partial Remedy For The Lois Trustees' Breach Of Fiduciary Duties

■ Henry's request for a remedy is hampered by the fact that it is unclear what the Lois Trustees would have done had Henry made a request for a distribution earlier than 1997. It is also hindered by the question of whether Henry himself would have done so. There is an undeniably speculative aspect to the remedial questions the court must address.

That being said, a close examination of the Lois Trustees' defense demonstrates a pervasive tendency to shift to Henry the burden of their own fiduciary failures. If Henry would have been reluctant to make a distribution request before 1997, a substantial part of that reluctance would have undoubtedly have flowed from his misunderstanding of how the Family Trusts worked. He was led to believe that the Lois Trust was "mother's trust" and that the Henry Trust was "his" trust. This understanding, of course, was not reflected in the Trust Instrument, as recognized by the more recent decisions of the Henry Trustees and the Lois Trustees. Furthermore, Henry was led to believe that mother's word ruled the Lois Trust. This was in practice somewhat truthful, but only because it reflected the Lois Trustees' practice of bending completely to the wishes of Lois.

The Lois Trustees' confidence that Henry would not have made a distribution request earlier is belied by the fact that Henry did make such a request in 1997, while his mother was competent, coherent, and (from Henry's vantage point) likely to hear about it. Candidly, I earlier harbored great doubts about whether Henry would have dared make a request for a distribution from his mother's trust for fear of risking a breach in their relationship that would result in further emotional

and financial injury to him. The reality is, however, that Henry did make a request at a time when his mother possessed all her faculties. The fact that none of the Siblings nor Lang Smith told Lois about Henry's request does not mean that Henry knew that Lois would not find out.[59]

As important, I find it significant that Henry's request was met by relatively speedy action (by Lois Trustee standards) to begin making distributions out of the Lois Trust. The Lois Trustees obviously recognized that it was at least questionable whether it was proper to sit on the Lois Trust corpus as the ultimate "belt and suspenders" insurance policy for Lois while the other beneficiaries had desires and interests that could have been advanced by at least some distributions. As a result, had Henry made an earlier distribution request, I believe it is likely that some distributions would have started to flow earlier. Had he been told about his status in, for example, 1987, I also believe it likely that Henry would have made a distribution request before January 1997.

Anticipating that these conclusions could be drawn, the other parties stress the lack of need for distributions earlier. They note that Henry lived quite well. As one of the lawyers put it at trial, however, this case is not about need. Just as I rejected Henry's appeal to economic equality earlier, I also reject the other parties' attempt to excuse the Lois Trustees' breaches on the grounds that Henry would have simply used any extra money to satisfy his wants. The Other Siblings are taking substantial distributions out of the Lois Trust even though their wealth far exceeds Henry's. None of the beneficiaries are in a position to argue that the distribution policies of the Lois Trust should be tailored to ensuring that beneficiaries live simply an upper middle-class lifestyle.

For nearly a decade, the Lois Trustees permitted the Lois Trust corpus to grow and grow, without giving any consideration to whether Henry's Branch might have needed distributions.[60] Although Cameron and Justin do not complain about this decision, I note that a diligent group of Lois Trustees could have discerned that Cameron and Justin had needs during that period that were not being satisfied. Those needs could easily have been met with distributions to them that would still have permitted the Lois Trust corpus to grow enormously during the 1987–1997 period.

The Lois Trustees also claim that they made a reasoned decision to maintain the corpus as a back-up plan for Lois, in case the Marital Trust was insufficient to meet her needs. That claim is not supported by evidence that I find convincing. The Marital Trust far exceeded the Lois Trust in value. Even if it was sensible to ensure that the Lois Trust continued to appreciate in value to protect Lois, there is no evidence that the Lois Trustees considered a more balanced program that would pay out, for example, half of the income annually, thus permitting the principal to grow while meeting objectives of other beneficiaries. Most notably, the advisors for the Other Siblings participated in the decision to stop all distributions, a policy that might have made sense for them given their greater wealth. Henry's Branch had no such input, and its needs were not taken into account. As significant, this change in

---

59. And surely, Henry must have believed his mother would hear about this lawsuit which was filed in August 1997.

60. *See, e.g., Ahuna v. Department of Hawaiian Home Lands,* 64 Haw. 327, 640 P.2d 1161, 1170 (1982) (duty of impartiality is breached when trustee fails to consider the interests of all beneficiaries in its decisionmaking process).

distribution policy appears to have been made more by Lois and the Other Siblings' advisors than by the Trustees using any independent judgment.[61] This conclusion is supported by the Trustees' response to the request, in which they indicated that they would follow it until they received "further written direction." [62]

While I have found that the Equal Division and the 5% Unitrust Policy are a rational and permissible approach going forward, I also believe that Henry should receive some remedy for these breaches. When the Henry Trustees were confronted with their failure to notify Cameron and Justin, they made make-up distributions to them. When Henry made a demand for a similar make-up distribution to himself from the Lois Trust, the Lois Trustees denied that request.

I conclude, however, that a relatively modest make-up distribution should be made as part of an equitable remedy for the breaches of the Lois Trustees. This remedial order is in keeping with court orders in analogous trust cases.[63] Given the rapidity with which the Lois Trustees reacted to Henry's request in 1997, I believe a make-up distribution also comports with what would have likely resulted had Henry been informed of his rights in a much more timely manner, been informed of the fact that the named beneficiaries were not invariably the exclusive concern of the Family Trusts during their lifetimes, and made an earlier distribution request. In sizing the make-up distribution, I am guided less by science than by equitable sensibilities and a reluctance to grant a remedy out of proportion to the breach. While I think it likely that distributions

**61.** *Cf. In re Murray,* 142 Me. 24, 45 A.2d 636 (1946) (where trustees blindly relied on beneficiary's word that she needed a substantial distribution out of trust principal, they abused their discretion by surrendering that discretion to her); *Jacob v. Davis,* 128 Md.App. 433, 738 A.2d 904, 918 (Spec.App.1999) ("It is a fundamental principle of trust law that a trustee may not delegate discretionary duties. Professor Scott explains: ... 'A trustee is under a duty not to delegate to third persons the doing of acts that he can reasonably be required personally to perform.... It is improper for one of the trustees to leave to the others the control over the administration of the trusts. A trustee who remains inactive is guilty of a breach of trust.' ") (*quoting* Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 184, at 560–61 (4th ed.1987)).

**62.** JX 61.

**63.** Many of the trust cases deal with more traditional structures in which there is a life interest in income, followed by remainder interests. Nonetheless, even with the broad discretion given to the Lois Trustees, they had a duty to consider the interests of the different generations of McNeil Family beneficiaries impartially and to exercise a reasoned discretion in making allocational decisions. That

is, the Lois Trustees could make decisions having a disparate impact but had to do so in a rational, unbiased way. Having found that the Lois Trustees did not do so, this court has an obligation to use its remedial powers in a responsible way. *Cf. In re Young,* Del.Ch., 1981 Del.Ch. Lexis 474, at *6, *8, Brown, V.C. (May 14, 1981) (compelling a trustee to pay to a beneficiary sums necessary to fulfill the expressed purposes of the trust); *Maryland National Bank v. Merson,* 249 Md. 353, 239 A.2d 905, 910 (1968) ("where there has been an action of partiality committed, but no evidence of bad faith, then certainly the courts should consider action which would require the trustee to make a distribution from the corpus to remedy the inequity"); *see also* George Gleason Bogert, *Trusts & Trustees* § 541 (2d ed.1993) (stressing desirability of intergenerational impartiality); *Gimbel v. Bernard F. and Alva B. Gimbel Foundation, Inc.,* 166 Conn. 21, 347 A.2d 81, 88 (1974) (in a case dealing with life-income beneficiary and remainder interests, emphasizing the duty to "deal impartially with the successive beneficiaries"); *In re Frances M. Johnson Trust,* 211 Neb. 750, 320 N.W.2d 466, 469 (1982) (stating general rule that trustees may not sacrifice the interests of life-tenant income beneficiaries in order to increase the value of the trust principal).

would have flowed earlier had the Lois Trustees fulfilled their duties, I also believe that those distributions would not have been as large as Henry claims. Thus, I conclude that after the Equal Division is made, a make-up distribution equal to 7.5% of the value of the Resulting Trust for the Henry Branch should be made, split between Henry, Cameron, and Justin in accordance with the current formula for dividing unitrust payouts. This distribution will give Henry capital to pursue some of his worthy endeavors,[64] and give Cameron and Justin similar stakes they can use for themselves and for their own future offspring.

## 2. One Of The Lois Trustees Should Be Removed As A Trustee Of the Resulting Trust For The Henry Branch

■ Henry also seeks the removal of the current Lois Trustees, who he says have displayed a callous disregard for his rights and interests. In the earlier case involving the Henry Trust, I refused to remove the Henry Trustees despite finding that their actions had been less than diligent and praiseworthy.[65]

At that time, I noted that Delaware law places a high burden on a beneficiary seeking the removal of a trustee:

> Our law regards the removal of a trustee as an extreme form of equitable relief that should be exercised sparingly. *In re Heizer Corp.*, Del.Ch., C.A. No. 7949, 1988 WL 58272, at *21, Berger, V.C. (June 6, 1988). "When, therefore, the trust property is not endangered by a lack of capacity, honesty or fidelity, some mere negligent breach of duty arising largely from an honest mistake, may not be sufficient to justify removal."

*In re Catell's Estate*, Del.Ch., 38 A.2d 466, 469–470 (1944). The court should not remove a trustee merely because she has "acted otherwise than as the [c]ourt would have deemed expedient, or upon grounds not altogether satisfactory to the [c]ourt...." *Massey v. Stout*, Del. Ch., 4 Del.Ch. 274, 281[, 1871 WL 2090] (1871). Whether to remove a trustee for breach is a decision within the sound discretion of the court. *Broeker v. Ware*, Del.Ch., 29 A.2d 591, 598 (1942).[66]

In this case, Henry's request to remove the Lois Trustees is complicated by the fact that all the other beneficiaries of the Lois Trust oppose his request. Given my approval of the Equal Division, I find it inappropriate and unnecessary to consider whether the Lois Trustees should be removed from the Resulting Trusts of the Other Branches. The real problem is therefore what to do about the Trustees of the Resulting Trust in the Henry Branch.

Henry claims that the Lois Trustees have demonstrated a persistent pattern of treating him like a Family outcast, unworthy of equal consideration. His children, Cameron and Justin, take a different view, and want the Lois Trustees to continue in office. They have confidence that the Lois Trustees will give their interests fair weight and not bend to Henry's will.

■ The problem with Cameron's and Justin's desires is that it fails to recognize that the Lois Trustees' performance violated acceptable standards of care for an intolerably long period of time. I do not come to that conclusion lightly. The Lois Trust Instrument reflects Mr. McNeil, Sr.'s intention that the Lois Trustees be

---

64. Such a distribution would enable Henry to pursue an interesting art project involving the installation of a sculpture garden by Sol Lewitt at Henry's reclaimed farm property in New Jersey. JX 240.

65. *Bishop,* mem. op. at 65–67.

66. *Id.* at 65.

protected from liability unless they acted in bad faith or with gross negligence. A mere mistake therefore is not an appropriate basis upon which to assess damages against the Trustees, and would certainly not support their removal.

This case, however, involves a group of Trustees that let the named beneficiary run the show, without giving any consideration to Henry's Branch. The Lois Trustees unthinkingly perpetuated a Family divide that gave the Other Siblings influence and information about the Lois Trust that Henry did not receive. The Lois Trustees fashioned a distribution policy with the input of the Other Siblings' advisors and neglected Henry's Branch. The Lois Trustees misinformed Henry and his advisors about his status, while accurately informing the Other Siblings about their status. When confronted with this pattern of (perhaps unthinking) favoritism, the Lois Trustees showed no remorse or sympathy toward Henry.

While Henry's own feisty litigation-based strategy and maximalist appetite for distributions may explain the Lois Trustees' reaction, it does not excuse it. Henry had every reason to feel that the Lois Trustees had lined up on the other side of the Family divide from him. He also had reason to be befuddled by the fact that the Henry Trustees took the litigation position that Henry was wrong for treating the Henry Trust as his own in his dispute with Cameron and Justin, while the Lois Trustees simultaneously justified their exclusion and disregard for Henry on the grounds that they did precisely what Lois wanted them to do.

I find particularly problematic the role of the Lois Trustees who were trust institutions. One of the major reasons why such institutions are selected as trustees is to bring their professional expertise to bear in assisting lay trustees like Mather, Bennett, and now O'Malley. PNC and Wilmington Trust both knew that it was the obligation of the Lois Trustees to inform adult beneficiaries of their status. Neither institution discharged that obligation to Henry. Having seen this failure now in two of the Family Trusts, I can no longer excuse it as simple negligence, especially when that failure was coupled by the transmission of misinformation that neither of the institutions bothered to correct. Given these facts, Henry has every justification to lack confidence in PNC to responsibly act as a General or Administrative Trustee on his behalf.[67]

The individual Trustees, however, are in a different posture. In a group of Trustees, it is natural that there be a division of labor. It is apparent that Mather has long played a healing and communicative role towards the beneficiaries of the Family Trusts. While he should have done more than he did to make sure that Henry was accurately informed of his status under the Lois Trust, I come away from two trials with a confident belief in Mather's good faith and sincere concern for all the Family members, including Henry. Though Mather should have been less susceptible to Brodhead's domination, that era has long since passed. Moreover, it was understandable that Mather, as an insurance executive, would rely heavily on the superior legal knowledge of the institutional trustees and Brodhead (a lawyer) in addressing matters such as the appropriate notification policies towards trust beneficiaries. These factors justify his retention as a Trustee.

---

67. As noted previously, Wilmington Trust departed as Administrative Trustee at the end of 2000 and was replaced by PNC.

The remaining Lois Trustee, O'Malley, joined as a Lois Trustee only recently. He is well qualified and cannot be held culpable for prior actions in which he did not participate. While Henry is suspicious because of O'Malley's ties to some of the other Trustees, those ties are not a sufficient basis to remove a well-motivated fiduciary with great expertise.

■ The quandary that remains, however, is how to balance Henry's interests and those of Cameron and Justin. While that cannot be done in a perfect way, an equitable resolution suggests itself. PNC should be replaced by Edward Bishop, who is a Trustee of the Henry Trust. Mather, O'Malley, and Bishop should then select another Administrative Trustee with input from Cameron and Justin, as well as Henry. The resulting group of Trustees will not be entirely satisfactory to Henry or Cameron and Justin. But it will be a group of competent, independent trustees.[68]

### 3. Should The Trustees Be Surcharged?

■ Because the make-up distribution and removal of PNC is a proportionate remedy, I decline to surcharge the Lois Trustees in any substantial amount. Such an award would be more punitive than remedial. Since the Lois Trustees failed to take Henry's interests into account at all for so long, however, I do conclude that the Lois Trustees who are parties should be surcharged for one-fifth of the commissions they received from the Lois Trust for the period 1987–1996, which amount should be allocated to the Resulting Trust for the Henry Trust if that would not have adverse tax consequences.[69] Otherwise, that repayment should be made to Henry, Cameron, and Justin in proportion to their share of unitrust distributions.

### 4. Should The Trustees Have To Bear Henry's Attorney Fees And Should The Lois Trust Bear The Fees Of The Beneficiary–Parties?

■ Henry asks that the Lois Trustees pay his attorneys' fees and costs. That request is governed by ordinary fee-shifting principles under exceptions to the American Rule. Those principles require Henry to demonstrate that the conduct of the Lois Trustees was egregiously improper.[70]

Although I have found that the Lois Trustees did not live up to the standard of conduct expected of them, there is no evidence that their failures resulted from bad faith. Rather, their miscues resulted from a persistent lack of careful thought and a too deferential attitude towards customs and practices put into place by Brodhead (most likely at Mr. McNeil, Sr.'s instance) early in the history of the Family Trusts. While the mistakes of the Lois Trustees did cause harm, that harm was limited and notably did not involve discriminatory distributions to the Siblings. For these rea-

---

68. It would be preferable if PNC would resign from the Henry Trust, and be replaced by O'Malley. This would ensure that the same group of Trustees was responsible for the Henry Branch's interests. Likewise, it would make sense if the Henry Trustee had the same Administrative Trustee as the Resulting Trust for the Henry Branch.

69. But no pre-judgment interest shall be charged on this amount against the Lois Trustees.

70. *Arbitrium (Cayman Islands) Handels AG v. Johnston*, Del.Ch., 705 A.2d 225, 231 (1997), aff'd, Del.Supr., 720 A.2d 542 (1998); *Wilmington Trust Co. v. Coulter*, Del.Ch., 208 A.2d 677, 682 (1965) (American Rule fee-shifting is unjustified except when the trustees' conduct is "of a gross or inexcusable nature.").

sons, I exercise my discretion to deny Henry's request for an award of his fees.

■ The Other Siblings seek an award of their own fees and costs out of Henry's share of the Lois Trust. They make no showing that they cannot bear these fees themselves, they simply argue that they were dragged into this litigation unnecessarily by Henry. But it was the Lois Trustees who asserted that the Other Siblings were necessary parties to this litigation. Moreover, although I agree with the Other Siblings that there is no evidence that they tried to harm Henry, there is substantial evidence that they had preferential input and information regarding the administration of the Lois Trust. Given this reality, Henry did not act in bad faith by directing discovery or claims their way.[71] And in view of the much greater wealth possessed by the Other Siblings, Henry's arguments against the Equal Division cannot be faulted. The Other Siblings can bear their own costs, or seek a distribution from the Trustees of the Resulting Trusts for their Branches after the Equal Division.

Similarly, Cameron and Justin have not convinced me that their fees should be borne by Henry. While their antipathy towards Henry renders Cameron and Justin unable to see it, the failures of the Lois Trustees can also be seen to have injured Cameron and Justin. Cameron and Justin are now receiving large distributions from the Henry and Lois Trusts and can afford their own lawyers; in the alternative, they can apply for a distribution from the Resulting Trust for the Henry Branch for this purpose, as can Henry on equal terms. The resolution of any such request will be up to the Trustees in the first instance.

## IV. *Conclusion*

For the foregoing reasons, (1) Henry has proven that the Lois Trustees breached their fiduciary duties to him; (2) Henry has not proven that the Equal Division or the 5% Unitrust Policy are improper and the Trustees' application for a declaration of the propriety of those actions is granted; (3) a make-up distribution of 7.5% of the value of the Resulting Trust in the Henry Branch shall be made to Henry, Cameron, and Justin in proportion to their share of unitrust distributions after the Equal Division; (4) PNC shall be removed as a general and administrative trustee of the Resulting Trust in the Henry Branch after the Equal Division and shall be replaced by Edward Bishop; (5) the general trustees of the Resulting Trust in the Henry Branch shall select a replacement Administrative Trustee for PNC after consultation with Henry, Cameron, and Justin; (6) the Lois Trustees who are parties shall pay back one-fifth of their commissions for the years 1987–1996 in accordance with this order; and (7) the parties shall bear their own fees and costs.

The parties shall submit a conforming order within seven days of this opinion.

---

**71.** Henry filed claims against the Other Siblings that were dismissed with leave to amend. Henry chose not to exercise that option and, for the most part did not, challenge the behavior of his Siblings at trial.