IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF THE THOMAS )
LAWRENCE REEVES IRREVOCABLE )
TRUST UNDER AGREEMENT DATED )     C.A. No. 8071-ML
FEBRUARY 26, 1997 )

MASTER'S REPORT
(Motion for Summary Judgment)

Date Submitted: February 19, 2015
Final Report: April 29, 2015

Matthew P. D'Emilio, Esquire, Jeremy D. Eicher, Esquire, Thomas A. Uebler, Esquire, and Mark M. Dalle Pazze, Esquire, of COOCH & TAYLOR, P.A., Wilmington, Delaware; Attorneys for Petitioner.

Gregory J. Weinig, Esquire, Scott E. Swenson, Esquire, and Mary I. Akhimien, Esquire of CONNOLLY GALLAGHER, LLP, Wilmington, Delaware; OF COUNSEL: Jack Guernsey, Esquire and Lorie Dakessian, Esquire of CONRAD O'BREIN, P.C., Philadelphia, Pennsylvania; Attorneys for Respondents.

LEGROW, Master

The beneficiaries of an irrevocable trust, who also are individual co-trustees of the trust, contend the corporate co-trustee mismanaged the trust over a period of fifteen or more years by unilaterally making investments without the authorization of the individual trustees, failing to implement any investment strategy for the trust, and charging excessive fees. The corporate trustee seeks to resign from the trust, but first seeks a court order to the effect that all of the individual trustees' claims are barred by laches or the statute of limitations.

The individual trustees frequently complained to the corporate trustee about the issues they now contend support their claims. In emails and letters dating back to 2004, the individual trustees complained that the corporate trustee invested without authorization, failed to consult the individual trustees or develop investment objectives or an investment strategy, and charged excessive fees. Despite consulting counsel, other trust companies, and the corporate trustee about these issues, the individual trustees took no action until they filed their counterclaims in 2013. Because the individual trustees delayed unreasonably, their claims are time barred. This is my final report.

## I. BACKGROUND

Except as noted, the material background facts are not in dispute. Although the parties disagree as to the truth of the factual allegations underlying the individual trustees' claims, the issue presented does not turn on a resolution of those disputed facts, but rather on the individual trustees' failure to pursue their claims in a timely manner. The petitioner has shown that it is entitled to summary judgment based on the undisputed facts in the record.

## A. The Parties

Thomas L. Reeves ("Tom")[1] was born on June 19, 1928.[2] Because of certain disabilities, Tom was unable to manage his property and on June 10, 1953, the Court of Common Pleas of Chester County, Pennsylvania (the "Pennsylvania Court") appointed Girard Trust Corn Exchange Bank as Guardian for the care and management of Tom's estate.[3] BNY Mellon Trust ("BNY Mellon") became the successor in interest to Girard Trust Corn Exchange Bank in 1983.[4] BNY Mellon is a state chartered bank with its principal place of business in Greenville, Delaware.[5]

William H. Reeves, IV ("Bill") and Grafton D. Reeves ("Grafton" and together with Bill, the "Respondents") are Tom's nephews.[6] Bill is a retired Senior Vice President and Senior Portfolio Manager of Putnam Industries who resides in Providence, Rhode Island. Grafton is a physician specializing in pediatric endocrinology who resides in Wilmington, Delaware.

## B. The Creation of the Trusts

During the mid-1990s, BNY Mellon – with the approval of the Pennsylvania Court – engaged in estate planning for Tom by creating two trust accounts: (1) a

---

[1] I use the parties' first names for the sake of clarity. No disrespect is intended.
[2] Exceptions of Co-Trustees and Beneficiaries William Reeves, IV and Grafton Reeves to the November 1, 2010 to October 31, 2012 Statement of Account of BNY Mellon, N.A., Co-Trustee for the Trust Established Under Deed of Thomas L. Reeves Dated March 10, 1997 (hereinafter "Exceptions") ¶ 6.
[3] *Id*. ¶ 4; Deposition of William Reeves (Feb. 26, 1997) (hereinafter "Bill Dep.") at 490-91.
[4] Stephen A. Rhoades, *Bank Mergers and Banking Structure in the United States, 1980-98*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM at 9 (August 2000), *available at* http://www.federalreserve.gov/pubs/staffstudies/2000-present/ss174.pdf.
[5] Pet'r.'s Mot. for Summ. J. (hereinafter "Mot. for Summ. J.") at 5.
[6] *Id*.

revocable trust designed to meet Tom's continuing needs, and (2) an irrevocable trust primarily designed for growth to benefit later generations of Tom's family.[7] The irrevocable trust (the "Trust") was created under the laws of Delaware and is the only trust at issue in this action.[8] Respondents are the current beneficiaries as well as two of the three co-trustees of the Trust, with BNY Mellon serving as the third co-trustee.[9] In 1997, the Pennsylvania Court approved a petition supporting the estate plan BNY Mellon designed.[10] As a result of this agreement, BNY Mellon's fees increased from about $5,000 to about $30,000.[11] The petition did not explicitly state that BNY Mellon's fees would increase by a factor of six, but instead stated that its fees would be in accordance with the bank's "standard fee schedule."[12] Respondents received a copy of BNY Mellon's fee schedule no later than 2004.[13]

The agreement governing the Trust (the "Trust Agreement") precluded distributions to any beneficiary during Tom's lifetime.[14] Instead, the Trust accumulated income during that time.[15] Using Tom's available exemption for federal generation-

---

[7] Ans. Br. of Resp'ts. in Opp. to Pet'r.'s Mot. for Summ. J. (hereinafter "Ans. Br.") at 4-5.
[8] BNY Mellon filed a petition for Adjudication with respect to the Revocable Trust in the Pennsylvania Court. That action remains pending. Ans., Affirm. Defenses, and Countercl. of William Reeves, IV and Grafton Reeves to BNY Mellon's Ver. Pet. for Decl. Relief and Confirmation of Accounting (hereinafter "Ans. & Countercl.") ¶17.
[9] *Id.*
[10] Mot. for Summ. J., Ex. 6 ("1997 Decree").
[11] Exceptions ¶¶ 31-32.
[12] *Id.*
[13] Mot. for Summ. J., Ex. 16.
[14] *Id.*, Ex. 15 ("Trust Agreement") at 1-5. The beneficiaries of the Trust are Tom's brother and sister, William H. Reeves III and Elizabeth S. Reeves. Upon Tom's death, the income was to be distributed to them in equal proportions or, upon their death, to their descendants in proportions determined by the trustees. *Id.*
[15] *Id.*

3

skipping transfer tax, the parties designed the Trust to confer some benefit on the beneficiaries, but not enough to cause the Trust to be part of their estates for federal estate tax purposes.[16]

Although there is some dispute as to whether the law firm that drafted the Trust Agreement and the petition supporting the estate plan actually represented Respondents, the record establishes that Respondents were at least involved with the Trust's creation. During the drafting of the Trust Agreement, Respondents requested that at least one of them be named co-trustee of the Trust.[17] BNY Mellon initially refused, but ultimately acceded to that request, permitting both to be named co-trustees.[18]

Respondents were provided drafts of the Trust Agreement and had the ability to review those drafts with counsel before the petition was filed with the Pennsylvania Court.[19] Additionally, in 1997, Respondents received executed copies of the Trust Agreement.[20] Nonetheless, Bill testified that he could not recall ever receiving the Trust

---

[16] *Id.*

[17] *Id.*, Ex. 10 (October 31, 1996 letter from Matthews expressing the family's desire to have at least one of Respondents named co-trustee).

[18] *See id.*, Ex. 9 (letter from Mellon Bank counsel dated March 4, 1996, stating Mellon Bank's preference was to remain the sole trustee as it already was the sole guardian).

[19] *See, e.g., id.*, Ex. 7 (fax from Guy Matthews, Esq. of Eckell Sparks to Bill stating, "[a]ttached please find copies of the Trusts to be discussed during our conference call this afternoon"); Deposition of Guy F. Matthews (Feb. 26, 1997) (hereinafter "Matthews Dep.") at 40-41, 61 (Matthews stating that he reviewed drafts of the Trust Agreement with Respondents); Mot. for Summ. J., Ex. 8 (letter to Respondents enclosing a copy of Trust Agreement prior to presenting it to the court).

[20] Mot. for Summ. J., Ex. 12.

Agreement nor had he read it as of his deposition on July 22, 2014.[21] Grafton conceded that he had received the agreement at some point.[22]

## C. The Administration of the Trust

The Trust Agreement provides that the co-trustees shall administer the trust collectively. If, however, a dispute arises between the co-trustees regarding investment decisions, the individual trustees have the power to direct the corporate trustee:

> <u>Disagreement</u>: If my Trustees should disagree as to the sale, purchase, management or retention of an investment, my individual Trustees' decisions shall control and my corporate Trustee shall not review the investment at any time nor be subject to liability for acting in accordance with those directions.[23]

Respondents argue that the Trust Agreement prohibited the corporate trustee from acting unilaterally regarding any investment decisions for the Trust.[24]

BNY Mellon began administering the Trust almost immediately. On March 4, 1997, Senior Trust Counsel for BNY Mellon sent a letter to the Reeves stating it would make the decision to transfer money from the revocable trust to the irrevocable trust and that an investment officer would be in touch with them shortly to discuss what investments to make.[25] Approximately one month later, on April 30, 1997, BNY Mellon sold certain assets and placed $680,000 from the sale proceeds into the Trust account.

---

[21] Bill Dep. at 124, 181.
[22] Deposition of Grafton Reeves (Feb. 26, 1997) (hereinafter "Grafton Dep.") at 88.
[23] Trust Agreement XIX(e).
[24] Ans. Br. at 9-11, 22.
[25] Exceptions ¶ 20; Response to Exceptions of William Reeves, IV and Grafton Reeves to the November 1, 2010 to October 31, 2012 Statement of Account of BNY Mellon, N.A., Co-Trustee for the Trust Established Under Deed of Thomas L. Reeves Dated March 10, 1997 (hereinafter " Response to Exceptions") ¶ 20.

5

BNY Mellon informed the Reeves of this fact six weeks later.[26] From the period of April 1998 to December 2003, BNY Mellon transferred an additional $520,000 into the Trust account.[27] Respondents expressed concern about these investments, but did not direct BNY Mellon to implement any other investment strategy.[28]

From 1998-2001, BNY Mellon did not make any investments and instead retained a large cash balance in the Trust account, of which Respondents were aware by at least 2001.[29] The correspondence shows that BNY Mellon proposed its investment strategy in 1997, recommending the cash in the Trust be invested. Respondents, however, did not commit to the investment program BNY Mellon recommended, nor did they recommend their own investment strategy.[30] To the contrary, at various points the individual trustees directed BNY Mellon to retain the cash in the Trust.[31]

The record also shows BNY Mellon sought several meetings over the years with Respondents. BNY Mellon met with Respondents in Rhode Island in January 2004[32] and attempted to meet with them in February 2004, June 2005, December 2005, and May 2007, but Respondents declined.[33] Despite these efforts, Respondents allege that BNY Mellon was obligated to "force" a meeting between the co-trustees to determine a proper

---

[26] Exceptions ¶¶ 21-22.
[27] *Id.* ¶ 22.
[28] Response to Exceptions ¶¶ 25-28.
[29] Exceptions ¶ 23; Grafton Dep. at 162; Bill Dep. at 169-70, 386.
[30] Mot. for Summ. J., Ex. 37.
[31] *See, e.g., id.*, Ex. 38 (July 2001 email from Bill directing BNY Mellon not to invest in the Trust); Ex. 45 (April 2008 email from Grafton, "I discussed the situation with Bill. We've decided to keep everything the same for now"); Ex. 47 ("[T]here should be no buying or selling of investments w/o the trustees authorization"); Bill Dep. at 410-11 (admitting he directed BNY Mellon not to invest the cash).
[32] Mot. for Summ. J., Ex. 31, 32.
[33] *Id.*, Ex. 33-35.

course of investment since it had no power to act on its own. Tom passed away on October 3, 2008, and Respondents then became income beneficiaries in addition to co-trustees, but contend BNY Mellon still did not ascertain their preferences regarding investment objectives or risk allocation.[34] Respondents have not identified any other specific investment decisions or practices after 2008 as deficient, other than their contention that BNY Mellon continued to neglect its obligation to "force" the individual trustees to meet and agree upon an investment strategy.

Although Respondents now profess a lack of knowledge about the Trust Agreement and their ability to control investment decisions, the record shows that BNY Mellon advised Respondents many times of their power to control the investment strategy and complied with many of their requests. For example, in January 2004, Bill suggested that BNY Mellon liquidate all stocks and bonds in the Trust, which BNY Mellon agreed to do subject to the execution of signed authorizations from Respondents.[35] Respondents, however, did not execute the requested authorizations.[36] Other examples of BNY Mellon's reminders to the individual co-trustees include: (1) a November 2006 e-mail from BNY Mellon stating that "[Respondents] outvote [BNY Mellon], so [BNY Mellon] will certainly comply with [Respondents'] wishes,"[37] (2) an April 2007 e-mail from BNY Mellon reminding Respondents to "please keep in mind that [they] have the power to

---

[34] Ans. & Countercl. ¶¶ 10, 48. Exceptions ¶ 28.
[35] Mot. for Summ. J. at 9.
[36] *Id.*, Ex. 17.
[37] *Id.*, Ex. 18.

7

overrule Mellon regarding investment decisions,"[38] and (3) a May 2008 e-mail again stating that Respondents outvote BNY Mellon.[39] Respondents, however, never overruled any of BNY Mellon's investment decisions or directed it to make an investment over BNY Mellon's objection.

Over the years, Respondents demanded many times that BNY Mellon inform them as to how the Trust was governed, but contend they never received a sufficient reply. For example, Bill requested information about BNY Mellon's investment authority some time before September 9, 1997, the date when a BNY Mellon employee responded to the Reeves by providing Bill with a copy of the Pennsylvania Estates & Fiduciary Code.[40] On other occasions, Respondents requested information about investment decisions and who retained investment authority. In response, BNY Mellon sent copies of the Trust Agreement for Respondents to review.[41] This was insufficient to Respondents; they contend the corporate trustee was obliged to analyze the agreement and explain to the individual trustees why it was able to make decisions regarding investment practices.[42]

The record, however, including several e-mails from Bill, reflects the individual trustees' knowledge of the trust and the trustees' rights and obligations vis-à-vis each other. For example, in January 2004 Bill wrote to BNY Mellon that "it is Graftons [sic]

---

[38] *Id.*, Ex. 19.
[39] *Id.*, Ex. 20.
[40] Ans. Br., Ex. 5 (letter dated September 9, 1997).
[41] Ans. Br. at 12-16.
[42] *Id.*

and my understanding that any investments made in/for these trusts must have our approval as trustees …."[43] Similarly, in an e-mail later that month, Bill stated

> Also re setting up acct investment management instructions, legally/as fiduciary, as trustees we do need to come up [with] a formal trustee investment policy and document (see my last email) for this/GST and the TLR trust acct…until that is done, its [sic] my understanding that any activity away from cash/cash equivalents is unauthorized and improper…we need to get this acct compliant with fiduciary standards.[44]

## D. The Accounting

Respondents argue that BNY Mellon further breached its fiduciary duties by failing to surrender certain accounting statements. Particularly, they allege that BNY Mellon has not submitted a full and complete accounting from the inception of the Trust through the present.[45]

Bill admits he received at least some trust account statements, but argues they were not sent regularly until approximately 2002 or 2003.[46] BNY Mellon, however, argues Respondents have received quarterly statements detailing every asset, transaction, and fee of the Trust since 1997.[47] BNY Mellon further contends that, in addition to the

---

[43] Mot. for Summ. J., Ex. 16.
[44] *Id.*, Ex. 17. *See also id.*, Ex. 35 (2007 email from Bill explaining his interpretation of BNY Mellon's authority as co-trustee), Ex. 56 (2010 email from Suzanne Reeves to Grafton interpreting the parties' fiduciary responsibilities).
[45] Ans. & Countercl. ¶¶ 41, 59.
[46] Bill Dep. at 164-65.
[47] *See* Mot. for Summ. J., Ex. 21 (Affidavit of David Rowe); Mot. for Summ. J., Ex. 22 (internal BNY Mellon email confirming Respondent's receipt of quarterly statements since 1997). Respondents attached a copy of this accounting to their answer. Ans. & Countercl., Ex. 3.

statements, it provided Respondents with regular reports and updates of investment activity and investment proposals.[48]

On February 19, 2010, BNY Mellon provided Respondents with a complete accounting from the inception of the Trust until December 31, 2009 (the "2010 Accounting").[49] The documents disclosed all "receipts, gains, losses, disbursements, and distributions of the Irrevocable Trust."[50] To Respondents, however, this was insufficient. Respondents believe that BNY Mellon had the duty to advise the co-trustees on how the Trust is governed and to "expl[ain] that a meeting of the co-trustees to discuss and vote on investment policy was required."[51] Other than this continuing complaint, Respondents have not identified how the 2010 Accounting is incomplete.

## E. The Relationship Deteriorates

The parties' relationship grew more and more contentious over the years. Respondents continued to raise questions about BNY Mellon's management practices and investment authority, and in several emails exchanged beginning in 2004, Respondents threatened litigation if BNY Mellon's alleged mismanagement continued. Some examples include (1) a 2004 email from Bill to BNY Mellon stating "we need to

---

[48] *See, e.g.,* Mot. for Summ. J., Ex. 24 (June 6, 2001 letter enclosing expense breakdown and stating "[w]ith your approval, we have started the process to invest the assets in the irrevocable trust"); Mot. for Summ. J., Ex. 27 (February 2002 letter from BNY Mellon to Bill stating "[w]e continue to maintain a large cash balance in this trust at your request"); Mot. for Summ. J., Ex. 26 (January 2004 memorandum documenting a meeting with Bill discussing the trusts); Mot. for Summ. J., Ex. 25 (March 1, 2005 letter seeking approval of enclosed investment recommendations).

[49] Mot. for Summ. J. at 11.

[50] *See id.*, Ex. 77.

[51] *See, e.g., id.* at 22.

get this [account] compliant [with] fiduciary standards"[52]; (2) a 2004 BNY Mellon internal memorandum created after the parties' Rhode Island meeting, expressing Respondents' concern with BNY Mellon making investments without their prior approval;[53] (3) a 2006 email from Grafton and Bill jointly explaining why they wanted to move the Trust to a different bank, citing [i]nvestment [management]/fiduciary [i]rregularities, [i]mproprieties[,] and possible [i]llegalities"[54]; (4) a 2007 email from Bill to BNY Mellon stating he and Grafton would be meeting with an attorney to discuss legal remedies for the alleged violations,[55] and (5) a 2010 email between Suzanne and Grafton Reeves discussing BNY Mellon's alleged fiduciary violations.[56] Respondents never followed through on the litigation threat, however, until BNY Mellon filed this action.

In late 2006, Respondents asked BNY Mellon to resign as co-trustee so they could move the Trust to Wilmington Trust. In an email dated May 8, 2007, Bill stated:

> Re meeting w [you] and Jeb, there is really no need to do so…our issues [are with] the bank as guardian/fiduciary and investment mgr: the investment vehicle, no investment policy, unauthorized investing/trading, abnormally large cap gains taken and taxed [sic] paid. This acct was run for the benefit of the bank not the customer…the issues here [are] going to be looked at by Grafton and [I] and an atty and we will determine if we think there is suffient [sic] grounds for seeking damages or possibly use an industry/business expose on trust acct mgmt, esp where the bank acts as fiduciary and invest mgr.[57]

---

[52] *Id.*, Ex. 17.
[53] *Id.*, Ex. 26.
[54] *Id.*, Ex. 18.
[55] *Id.*, Ex. 35.
[56] *Id.*, Ex. 56.
[57] *Id.*, Ex. 35.

11

In August 2007, BNY Mellon stated that it could not be removed during Tom's lifetime since it served as Tom's guardian.[58] It would agree to resign, however, on the condition that the Pennsylvania Court approved a 5% termination fee[59] and Respondents and the remainder beneficiaries of the Trust executed a release of claims agreement for any mismanagement that may have occurred.[60] Respondents did not agree to the stipulations nor did they remove BNY Mellon after Tom's death in 2008.[61]

BNY Mellon filed its Verified Petition in this action on November 29, 2012, alleging that because of Respondents' lack of cooperation, it had not been able to invest the Trust's assets in a manner consistent with its recommendations. BNY Mellon sought an order permitting it to resign as co-trustee, approving an accounting from November 1, 2010 until October 31, 2012 (the "2012 Accounting"), and declaring that any and all claims before November 1, 2010, are time barred.[62]

Respondents filed their answer and exceptions on March 5, 2013, asserting that the 2012 Accounting was procedurally improper and incomplete and that BNY Mellon breached its fiduciary duties by making unauthorized investments, failing to make other investments, and charging excessive fees. Respondents essentially contend BNY Mellon had heightened fiduciary duties as the sole professional trustee and should have been more forthcoming in its communications. Particularly, Respondents allege that the accounting is incomplete because it does not clarify the parties' respective roles in

---

[58] Ans. Br., Ex. 1.
[59] *Id.*
[60] Grafton Dep. at 111.
[61] *See* Ans. Br. at 25.
[62] Ver. Pet. for Decl. Relief and Confirmation of Accounting ¶¶ 35-42.

governing the Trust. Furthermore, Respondents allege BNY Mellon should have stated the exact increase in BNY Mellon's fees in the 1997 petition to the Pennsylvania Court, instead of misleading that court and the individual trustees by stating that the bank's fees would be in accordance with its "standard fee schedule." For those reasons, Respondents contend their claims against BNY Mellon should not be barred as untimely and the 2012 Accounting should not be approved.

After completing discovery, BNY Mellon filed a motion for summary judgment on December 12, 2014. I heard oral argument on February 19, 2015. The Pennsylvania action, which involves similar claims as to the Revocable Trust, remains pending.

## II. ANALYSIS

Summary judgment should be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[63] The Court views the evidence presented, and all reasonable inferences to be drawn therefrom, in the light most favorable to the non-moving party.[64] The moving party has the burden to show no material facts exist.[65] Once the initial evidentiary burden is met, the nonmoving party must submit "specific facts showing that there is a genuine issue for trial to survive the motion for summary judgment."[66]

---

[63] Ct. Ch. R. 56.

[64] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 241 (Del. 2009).

[65] *Johnson v. Shapiro*, 2002 WL 31438477, at *3 (Del. Ch. Oct. 18, 2002).

[66] *In re Novell, Inc. S'holder Litig.*, 2014 WL 6686785, at *6 (Del. Ch. Nov. 25, 2014) (quoting *Goodwin Live Entm't, Inc.*, 1999 WL 642565, at *5 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999)).

BNY Mellon argues that judgment should be entered in its favor because Respondents had actual knowledge of the administration of the Trust when they received the 2010 accounting, if not before, and that Respondents' claims therefore are barred by laches or the statute of limitations. In response, Bill and Grafton contend that there are too many material facts in dispute and that further development of the background and context is needed given the complex history and unique circumstances of the case.

## A. Respondents' Claims are Time-Barred

As a court of equity, the Court of Chancery generally is not strictly bound by a statute of limitations.[67] Instead, this Court applies the doctrine of laches to determine whether an action is filed timely.[68] The doctrine serves as an equitable defense against a plaintiff who unreasonably delays pursuing a claim after learning that his or her rights were infringed upon.[69]

Although most statutory limitations periods do not automatically bar an action in equity, those statutes provide the presumptive period of what constitutes an unreasonable delay in bringing a claim.[70] Absent unusual or mitigating circumstances such as a tolling of the limitations period,[71] when the analogous limitations period at law has run, "a plaintiff is barred from bringing suit without the necessity of the court engaging in a

---

[67] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).
[68] *TrustCo Bank v. Matthews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015).
[69] *Levey v. Brownstone Asset Mgmt, LP*, 76 A.3d 764, 769 (Del. 2013).
[70] *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996). There are occasions when a statute of limitations may apply directly to a claim filed in this Court. *See, e.g., Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 583-84 (Del. Ch. 1994).
[71] *Whittington*, 991 A.2d at 9. Tolling can be established by (1) fraudulent concealment; (2) an inherently unknowable injury, or (3) equitable tolling. *Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006), *aff'd*, 906 A.2d 806 (Del. 2006).

traditional laches analysis."[72]   In this case, Respondents had actual and constructive knowledge of the alleged wrongdoing many years before bringing their claims and have put forth no plausible reason why they waited so long to seek redress.  I therefore find that their claims are barred by laches.

There are two applicable statutes of limitations in this case:  (1) 12 *Del. C.* § 8106, which bars personal tort claims arising three years after the date of the action, and (2) 12 *Del. C.* § 3585, which precludes a claim for breach of trust that occurs:

> (1) two years after the date the beneficiary was sent a report that adequately disclosed the facts constituting a claim; …. [] A report adequately discloses the facts constituting a claim if it provides sufficient information so that the beneficiary knows of the claim or reasonably should have inquired into its existence.[73]

Respondents asserted claims against BNY Mellon for the first time on March 5, 2013. Accordingly, a report to Respondents before March 5, 2011, which adequately disclosed facts constituting a claim, would bar those claims.  Similarly, absent tolling, any claims that arose before March 5, 2010, are barred under Section 8106.

The undisputed facts of record show Respondents' claims are barred under both statutes.   First, the 2010 Accounting adequately disclosed the facts underlying Respondents' claims, namely (1) investments BNY Mellon made that Respondents contend were unauthorized, (2) the cash position maintained during the accounting

---

[72] *Albert v. Alex Brown Mgmt. Servs., Inc.,* 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005).

[73] The argument reasonably could be made that the legislature intended Section 3585 to apply directly to claims filed in Chancery and falling under the statute.  *See Kahn v. Seaboard Corp.*, 625 A.2d 269, 271-72 (Del. Ch. 1993) ("statutes of limitation *could* apply directly to causes in Chancery of every sort.  It is within the constitutional power of our legislature to do so.  Indeed, in England, whence our own law on the subject originates, actions against trustees are now (since at least 1980) subject to a comprehensive statute of limitations.").  The parties, however, have not squarely addressed this issue, nor does its resolution affect the outcome of the case.

period, and (3) the fees BNY Mellon charged during the period. Putting aside what else Respondents knew based on other interactions with the corporate trustee, the 2010 Accounting disclosed all the information to place Respondents on notice of their claims. Because the 2010 Accounting was sent to Respondents more than two years before the counterclaims and exceptions were filed, claims arising from the facts disclosed in that accounting are time-barred.

In addition, the record also conclusively demonstrates that Respondents had actual notice of the facts constituting their claims, and in fact repeatedly threatened to litigate those claims, many years before they finally filed their counterclaims and exceptions. Bill's emails show he had been complaining since at least 2004 about BNY Mellon's fees, its unilateral investment decisions, and its failure to meet with the individual trustees to develop investment objectives and strategy or obtain the individual trustees' authorization to implement an investment strategy.[74] The record also shows Respondents were aware of the cash held in the Trust and alternated between complaining about that and instructing BNY Mellon to continue to hold the cash.[75] Finally, Bill testified he was aware that there was a problem since the late 1990s to early 2000s.[76] Respondents offer no coherent explanation of their delay in bringing these claims, and that unreasonable delay of at least nine years bars the claims under Section 8106.

---

[74] *See, e.g.,* Mot. for Summ. J., Exs. 17, 18, 26, 34, 35, 56.
[75] Exceptions ¶ 23; Grafton Dep. at 162; Bill Dep. at 169-70, 386, 410-411; Mot. for Summ. J., Exs. 38, 45, 47.
[76] Bill Dep. at 455-57.

Respondents argue, however, that the "governance failures" committed by BNY Mellon never were adequately disclose and that, in any event, Delaware law does not permit a fiduciary to "blame the victim" for his failure to ferret out faithless conduct and bring suit. As to the first argument, as set forth above, the facts of record compel the conclusion that what Respondents characterize as "governance failures," i.e., BNY Mellon's failure to "force" the individual trustees to meet and decide upon an investment strategy, were well known to Respondents and formed the basis of many of Respondents' complaints over the last decade. Although the individual trustees now profess ignorance regarding their fiduciary obligations and the trustees' respective powers and obligations, the communications Respondents had with BNY Mellon (and others) show the individual trustees characterized the unauthorized investments and lack of agreed-upon investment strategy as failures of fiduciary management and oversight.[77]

As to the argument that BNY Mellon cannot avoid liability by "blaming the victim," Respondents cite *McNeil v. Bennett*[78] and *In re the Volftsun/Landy Trust Litig.*[79] In *McNeil*, a corporate trustee and its individual co-trustees misinformed one of the trust's beneficiaries as to his status as a beneficiary.[80] This Court held that a corporate trustee had an affirmative obligation to inform trust beneficiaries of their rights.[81] The Delaware Supreme Court affirmed this part of the decision and declined to remove an

---

[77] Mot. for Summ. J., Exs. 17, 34, 56.
[78] 792 A.2d 190 (Del. Ch. 2001), *aff'd in part, rev'd in part sub nom. McNeil v. McNeil*, 798 A.2d 503 (Del. 2002).
[79] C.A. No. 4653-VCL (Del. Ch. Oct. 24, 2012) (TRANSCRIPT).
[80] 792 A.2d at 207-208.
[81] *Id*. at 211-12.

individual trustee from his position as such, even though he had served at the time the beneficiary was misled, because the individual trustee did not join in the deception and "was a layperson who relied upon the institutional trustees and [another individual co-trustee], who was a lawyer."[82]  In *Volftsun/Landy*, trust beneficiaries sued a professional trustee for its failure to implement any reasoned investment strategy.[83]  The court denied the professional trustee's time-barring defenses, holding that the beneficiaries had no reason to believe the professional trustee was acting in bad faith and in breach of its fiduciary duties.[84]

Respondents misread *McNeil* and misapply *Voltsun/Landy*.  The *McNeil* court did not, as Respondents argue, created a two-tiered system of liability under which professional trustees bear heightened responsibilities or under which lay trustees may avoid their own obligations by shifting blame to a professional trustee.  The holding in *McNeil* was based on the Court's finding that the lay trustee acted in good faith and trusted the professional trustee to address certain issues.  Similarly, in *Volftsun/Landy*, the Court concluded the limitations period was tolled by the beneficiary/co-trustees' justified reliance on the corporate trustee.  Here, the record shows the individual trustees did not repose any trust in the corporate trustee and repeatedly complained about the corporate trustee's actions, but nonetheless took no action to pursue their claims.  It is unclear what else, short of self-flagellation, BNY Mellon could have done to put Respondents on notice of their claims.  Neither case serves as a basis for Respondents to overcome a

---

[82] *McNeil*, 798 A.2d at 514.
[83] *Volftsun/Landy*, Tr. At 711.
[84] *Id*. at 723-24.

18

laches defense when they plainly had knowledge of what they contend was mismanagement by the corporate trustee.

At oral argument, although not in their brief, Respondents alluded to the idea that BNY Mellon's laches defense should be rejected because BNY Mellon was engaged in a "continuing wrong." Respondents alleged that the wrong-doing began from the inception of the Trust and because it has not yet been corrected to date, it qualifies as a continuing wrong. The continuing wrong doctrine is a legal theory that applies when a series of related wrongful acts are "so inexorably intertwined that there is ... one continuing wrong."[85] It is settled, however, that "the failure to remedy a wrong does not mean that the wrong is continuing."[86] Under Respondents' theory of the continuing wrong doctrine, so long as a wrong continues to go uncorrected, it is a continuing wrong. Although uncorrected wrongs remain wrongful until remedied, they do not fit within the narrow category of acts which are considered continuing wrongs.[87] To accept this interpretation of the doctrine would frustrate the purpose behind requiring parties to bring timely claims and bring nearly every claim within the category of a continuing wrong.[88]

Finally, although Respondents contend that the dispute should be resolved in a more nuanced setting of trial given the "complex" and "developing nature" of this area of the law, this Court is fully capable of deciding this issue as a matter of law. The parties

---

[85] *Desimone v. Barrows*, 924 A.2d 908, 925 (Del. Ch. 2007).

[86] *Id*.

[87] *See id*., quoting *Newkirk v. W.J. Rainey, Inc*., 76 A.2d 121, 123 (Del. Ch. 1950) ("Of course, in one sense every wrongful transaction constitutes a continuing wrong to the corporation until remedied. But if the rule embodied in [§ 327] is to be meaningful, then clearly 'continuing wrong' cannot be construed in such as sense because it would substantially defeat the statutory [purpose]").

[88] *See id*.

have compiled and submitted nearly one hundred exhibits that, in combination with the parties' briefs and argument, show there is no genuine question of any material fact. This case is no more nuanced than any other fiduciary case before the Court, nor does it implicate developing areas of the law.

### B. Remaining Claims and Defenses

The parties' remaining claims and defenses are moot. Because it is clear that Respondents' claims are barred for timeliness, it is not necessary to reach the question of acquiescence or ratification. Additionally, as they conceded at oral argument, Respondents waived any procedural challenges to the 2012 Accounting by failing to address that claim in their answering brief.

### CONCLUSION

For the foregoing reasons, I recommend that the Court grant BNY Mellon's Motion for Summary Judgment. This is my final report and exceptions may be taken in accordance with Rule 144.

Respectfully submitted,

/s/ *Abigail M. LeGrow*
Master in Chancery